# CHARLESTON.

## HOLSBERRY v. HARRIS.

Submitted June 17, 1904—Decided November 29, 1904.

1. PARENT AND CHILD—*Gifts inter vivos.*

   The possession by a son of land belonging to his father, even when accompanied by valuable improvements, will not be treated as sufficieint evidence of a gift, because the relation between the parties prevents the inference which would otherwise arise from the fact, and removes all necessity of accounting for the possession by the supposition of an existing contract. (p. 330).

2. PARENT AND CHILD.—*Possession.*

   Such possession of a son under an alleged gift must be definite, and exclusive, and not concurrent with the father.
   nite, and exclusive, and not concurrent with the father.     (p. 330).

3. PARENT AND CHILD—*Possession.*

   As between father and son, the mere physical fact of possession is not of itself conclusive, nor even material.     (p. 331).

4. PARENT AND CHILD.—*Evidence of Gift.*

   The evidence in case of a parol gift from father to child should be direct, positive, express and unambiguous, and its terms clearly defined. Loose declarations of the father without explanation are not sufficient evidence of a gift.     (p. 331)).

5. PARENT AND CHILD.—*Improvements by son after notice.*

   Improvements to amount of $500.00 or $600.00 made on premises occupied by a son by the sufferance of his father for a period of thirity years, the principal part of such improvements made after full notice to the occupant by the father that he would not give him the land upon which the improvements were so made, will not entitle the son to compensation for such improvements.     (p. 331).

6. LACHES—*Excuse.*

   A court of equity will not assist one who has slept upon his rights and shows no excuse for his *laches* in asserting them. (p. 332).

Appeal from Circuit Court, Barbour County.

Action by Henry Holsberry and others against Priscilla C. Harris and others. Judgment for plaintiffs, and defendant Priscilla Harris appeals.

*Reversed.*

MELVILLE PECK and W. T. GEORGE, for appellant.

J. HOP WOODS, for appellees.

McWHORTER, JUDGE:

Martin Holsberry was a farmer living at Kalamazoo in Barbour county and owned a farm situated at the junction of the Meadowsville and Philippi Roads, containing about two hundred and thirty acres, made up of two tracts one of one hundred and thirty-five acres conveyed to him by his father, John Holsberry, and another tract of about one hundred and eight acres conveyed to him by John Poling; the former deed from John Holsberry being dated in 1859, and the one from Poling in 1854. The two hundred and thirty acres composing the said two tracts were known as Martin Holsberry's Home Farm. Sometime in 1877 or 1878, Martin Holsberry gave to his son Henry Holsberry and conveyed to him thirty-two acres from the tract of one hundred and thirty-five acres, so conveyed to Martin by his father. This piece which was conveyed as thirty-two acres, turned out on being surveyed to be fifty acres. In 1870, Henry Holsberry was married and in 1871 went on to another portion of said two hundred and thirty acres, occupying a small log house of one room, which he continued to occupy until 1892, with the exception of about two years when he lived in another house on a tract conveyed to him about 1875 or 1876 by I. V. Johnson. In 1892 he repaired and added to the house, enlarging it, which improvement he completed in 1893. He also built two small granaries, a little stable, a small store house, and dug a well on the property. In 1895 Henry Holsberry sold his two tracts of land and left the property where he had lived and removed to Elk City, where he purchased a farm upon which he continues to live. On the 16th day of October, 1902, Martin Holsberry conveyed to his daughter, Priscilla Catherine Harris, wife of Ira Harris, the said home farm of two hundred and thirty acres, more or less, for and during her life time, and remainder to her children by

her husband, Ira Harris. On the 30th of October, 1902, Martin Holseberry departed this life. At the January rules, 1903, Henry Holsberry filed his bill in equity against Priscilla Harris, her four infant children, and Margaret B. Stalnaker, alleging the gift to him by his father, Martin Holsberry, of thirty acres of land, lying immediately within the angle of the said two roads, of which his said father had placed him in possession, and promised and assured plaintiff that the same should be and become his, and advised and directed plaintiff to erect upon the same the buildings and fixtures mentioned in the bill, with the assurance and promise to plaintiff that plaintiff's use and occupancy thereof, thereunder, should operate and vest title in plaintiff as fully and completely as if same was vested in him by conveyance; that relying upon said promise and assurance, plaintiff took possession thereof, with the full knowledge, consent, and direction of his father, and first built thereon in the year 1882, a store-room costing $200.00 wherein plaintiff carried on the mercantile business from the year 1882 until the year 1894, and wherein said Ira Harris, the husband of the defendant, Priscilla Harris, now carries on the same business, as the tenant by sufferance of plaintiff; that afterwards plaintiff built a dwelling house, thirty-six feet long by eighteen feet wide, with a two-story ell and kitchen, costing about $1,500, which was completed in the year 1893; that about the same time or soon after, he erected on said land two granaries, costing $38, a stable costing $100, and built a stone wall and made an earthen fill costing $25, had finished a well, costing $25, and set out fruit trees and made other improvements thereon, and occupied the same as a home for himself and family until the year 1895, when he left the said land and moved to his present home in Elk District; and at the instance and special request of his father, left the property to be rented by him for plaintiff, and to account to plaintiff for the rents and profits thereof, reserving the right, at the will of plaintiff, to his father to use one room of said dwelling house as a granary or store-room for himself; that the decedent had never paid plaintiff anything on said expenditures, or ever made him any advancements, except to the extent of about $600 in the way of money and personal property, and the conveyance to him of the said tract of land, which plaintiff afterwards sold for $500, its full value; that when his father on the 16th of October, 1902,

made the conveyance to Priscilla Harris, he was then living with her, and was then seventy-nine years of age, and describing the farm so conveyed "As the home farm of decedent whereon he resided, containing two hundred and thirty acres more or less;" that said farm then contained two hundred and thirty acres exclusive of the thirty acres given to plaintiff, and which was formerly a parcel thereof, and that he did not intend by said conveyance, and did not in fact, embrace the said thirty acres so given to plaintiff, and prayed that so much of the deed of October 16, 1902, as might be supposed to embrace said thirty acres bounded and described by a plat filed with the bill be set aside as a cloud upon the right and title of the plaintiff thereto, and a commissioner be appointed to convey same to plaintiff, or in default thereof for any reason, plaintiff might have a decree to be charged as a lien thereon, for the full amount and value of his buildings and improvements with interest to date and his costs. The infant defendants by their guardian *ad litem* filed their answer, and the defendant, Priscilla Harris, filed her answer denying the material allegations of the bill. Plaintiff filed his amended bill, joining with him as plaintiffs David Ruckman and Cora Stalnaker Ruckman against the same party defendants as mentioned in the original bill, making the original bill a part thereof, alleging that David Ruckman and Cora Ruckman are husband and wife, respectively, that Cora was the tenant by sufferance by the month at a dollar per month in possession of said parcel of said thirty acres of land, including the buildings of said plaintiff Henry Holsberry, by parol lease, and claiming under him and subject to disseizen at his will, said Cora making no claim against him to the contrary; that after the institution of this suit, Priscilla Harris had brought an action against said Cora before a justice in unlawful detainer, for the possession of said property; and praying for an injunction against her prosecution of said action which injunction was granted, to which amended bill, the defendant, Priscilla Harris filed her demurrer and answer denying that the Ruckmans or either of them were tenants of the plaintiff, and that if they, the Ruckmans, admitted such tenancy, it was fraudulent, and was done for the purpose of trying to defraud respondent and the other defendants out of said land; denying that said Cora Ruckman had any defense to respondent's action of unlawful detainer; denying that Henry

Holsberry ever had any title to any of the property mentioned in the bill or amended bill either legal or equitable, or that Cora. Ruckman or her husband, David Ruckman, were ever in possession of more than a portion of said dwelling house and one stall. in the stable which they once had, but did not have at the institution of the action of unlawful detainer; that Martin Holsberry never promised to give and never did give the property mentioned in the bills of plaintiff to the said plaintiff, and alleging that the rents of said premises were never collected by plaintiff nor were they ever collected for him by anyone; that plaintiff used said premises while he lived there, and averred that the rents of the same were worth much more than the costs of the improvements that he made; that plaintiff never paid any taxes on said land, but that the taxes were always paid thereon by Martin Holsberry upon this land as a part of his home farm; and that after plaintiff moved from said premises, Martin Holsberry rented and collected the rents therefor up to the time he conveyed the same to respondent and the other defendants for himself and not for Henry Holsberry. Depositions of many witnesses both for plaintiff and defendant were taken and filed in the cause, and on the 5th day of June, 1903, the same was brought on for hearing, when the court decreed that the defendants, Priscilla C. Harris and Margaret B. Stalnaker, sole heirs with the plaintiff, of the decedent, Martin Holsberry, do convey and release to the plaintiff their several interests as said heirs of Martin Holsberry, in and to that certain parcel of land in said bill and amended bill mentioned, supposed to contain about 30 acres, particularly mentioned and described by the plat filed with said bill, and upon their failure to make such deed, appointing a special commissioner to make the same in their behalf, and perpetually enjoined and restrained Priscilla Harris from prosecuting her said action of unlawful detainer against said Cora Ruckman for said 30· acres, and decreed costs to plaintiff against Priscilla C. Harris; from which decree Priscilla Harris appealed to this Court.

This is a suit to enforce the specific performance of a parol gift, and depends entirely on oral testimony. There is not a writing of any kind and as to the nature of the possession given plaintiff by his father, Martin Holsberry, there is no testimony except that of the plaintiff, which was incompetent under sec. 23 of chapter 130, Code. Verbal admissions made by his father,.

.Martin Holsberry, are sought to be proved to establish the fact
.that Martin had given him the property, and that he intended
:him to have it.    Andrew W. Stalnaker testifies that when he
-moved plaintiff Ruckman into the house, Martin refered to it as
Henry's house, and that by general report in the community it
-was called Henry Holsberry's property.    Virginia Holsberry,
plaintiff's wife, testified that Martin Holsberry told her husband
:he should have the land "said for him to build a store-house and
that he would make him a right for the land around there."
Idera Talbott daughter of plaintiff Holsberry, testified that she
heard Martin say "he intended to make a right to my father for
·all those buildings, and the ground around them.    That he never
intended to see him lose anything he put on there," and states,
when Henry Holsberry was moving from Kalamazoo to Elk City,
Martin Holsberry "Asked papa what he should do with the build-
ings if he should rent them.    Papa said rent them and then he
·said all right I will rent them and give you the rent."    Margaret
B. Stalnaker says her father, Martin Holsberry, always referred
·to the property as Henry's property.    M. F. Stalnaker states that
in a conversation with Martin Holsberry "He told me in the
year of 1895 the last of February or the first of March while
:standing between his house and the post-office that he intended to
give Henry Holsberry, taking in the long-meadow enough to in-
clude his buildings and running to John Holsberry's line and
then he intended for Henry to take his property and put it on
his own land, and Henry could run his and he would run his
own," which he says would embrace the land in dispute in this
suit.    A. W. Stalnaker says Martin Holsberry told him that "he
intended to give Henry on that side of the road, including his
buildings" and heard him "call it Henry's house and Henry's
-store."    Another witness, Garrett Nestor, said he heard Martin
say he intended the property for Henry.    Stelle Holsberry an-
·other daughter of plaintiff, says her grand-father, Martin Hols-
berry "said he had told papa to go ahead and build, that he in-
tended the buildings and land around them for him.    He was
plowing in the meadow in front of our door.    I was taking him
a drink of water."    The most improbable story, however, is told
by David Ruckman, one of the plaintiffs in the amended bill,
-when he says in his testimony "I have heard Mrs. Harris' chil-
.dren call it Uncle Henry's property," quite likely when it ap-

pears from the deposition of the plaintiff himself, that Mrs.. Harris' four children range in age from the eldest eight years down to two years. Several disinterested witnesses testify that they heard conversations between Martin Holsberry and plaintiff which were entirely the opposite of that claimed by plaintiff. Witness A. C. Keller says that he heard Martin Holsberry in the store-house at Kalamazoo tell his son Henry Holsberry "Not to build the house on the land where he did. If he did, he built it at his own risk; he told him to go and build the house upon his own land." He further testified "Henry says to him that he wanted to tear an old chimney down that was there. He says 'No, Henry, I am not going to have the chimney torn down,' and that that was about the way the conversation started;" and explained that this was the chimney to the back of the house in which Henry lived, and that the chimney stands there yet. Solomon S. Skidmore testified that he was working for Henry Holsberry, who requested him to go and ask his pap if he had ever made him a deed for any land there. "He said no, he never allowed to; he had given him all he expected to give him. He said he did not want any house put up there, and if he wanted to build, to go and build on his own land. He said he did not want any fine house there, and he said that ne was sharp enough when he set his orchard out to set it on his own land that he had given him." When asked if Martin Holsberry recounted to him there or mentioned to him what he had already given to his son, he said he had given him fifty acres of land on the upper end, which now is called the David Poling Land, and helped him to pay for what was called the Sam Poling Place. About $1,100 it had cost them. He said he had put about $500 in the store for Henry, and said at that time that he did not want any fine house put up there to pay taxes on; that he went back and told Henry what his father had said to him, and stated that that was before he built the house. Witness P. M. Godwin relates a conversation he had with plaintiff. Says he asked plaintiff "Doesn't this land belong to you where you are? He says 'I have no deed for it, but I think pap will make me a deed sometime,' and says he thinks this was before the house was repaired." Felix Skidmore gave a conversation he heard between Martin Holsberry and Henry Holsberry, and says "I was at Uncle Mart's working for him and Henry come there in the house at night or late in the evening, and he

had hauled a load of lumber that day; Henry had, and Uncle
Mart asked him what he was going to do with it, and he said
that he was going to build that house or repair it in which he
lived; and Uncle Mart told him that he had better build on his
own; Henry said why? and he said build on your own and he
said I have given you all that I expect to give you, go and build
on the land which I gave you." He says Henry told him that he
thought he ought to have. it. When Martin told him that he
could not have it; that he had given him all that he allowed to
give him." H. J. Poling testified that he was at the store at Kal-
amazoo, and Henry came there and called his father out in the
yard and asked him if he could not put some of his wheat in that
house. Martin said yes, you can put some grain in one room in
the loft, we have grain in the rooms below and we have them
occupied." Ira Harris · states that when Henry Holsberry left
the house in 1895, he asked "His father, Martin Holsberry, to
leave a part of his stuff in a part of that house; he said that he
had quite a lot of work to do over on his farm that he had bought,
and if he hadn't any objections that he would like to leave some
of his stuff in one room of the house until he could get time to
come after it. Martin Holsberry told him that it would be all
right to leave it there till he got his work straightened up so that
he could come after it." He stated that Henry Holsberry de-
livered the key of that house to his father when he left, and that
Martin Holsberry had the keys until his death; that one of the
keys he did not have all the time; J. W. Baylor had it a while,
and since that time David Ruckman had had it part of the time;
that Priscilla Harris has had the keys since Martin Holsberry's
death, except tae one David Ruckman had; that Henry Hols-
berry never called for or demanded the keys after the death of his
father. He further stated that Henry took from the house seven
windows; he took all the paper and canvass down with the ex-
ceptions of one room; that room was papered without any can-
vass, and he could not get that down. He also took the finishing
off of the portico. He says that Henry Holsberry's house had
burned down, and he came up after the remainder of the doors
and windows, and in order to keep them in the house, witness
paid him for them $26.24.

I have given substantially the testimony as far as the declara-
tions of Martin Holsberry are concerned, touching his intentions

as to giving Henry the property, the most important witnesses on behalf of plaintiff are his wife and daughters and his co-plaintiff Ruckman who was interested in preventing the further prosecution of the unlawful detainer case which he had enjoined under the amended bill. There is no allegation in the bill that Martin Holsberry ever agreed or promised to make plaintiff a deed for the property, yet plaintiff attempts to prove by his wife and daughters that he said he would make Henry "a right to it." Plaintiff fails to prove sole and exclusive possession of the property, as witnesses prove that they worked at harvesting and other work on the lands claimed by plaintiff, in the employment of Martin Holsberry; indeed the whole tenor of the evidence is to the effect that Martin Holsberry's possession was never interrupted by Henry, except perhaps as to the house alone, which was occupied by Henry and his family, and that seemed to be by the mere sufferance of his father, and the circumstances plainly show that when he left it he had no thought of claiming any further the right to retain possession. And when his house was burned at Elk City, he desired to have the windows and doors from the house he had left, to assist in re-building. His removal of the paper from the walls which was put up on canvass and otherwise dismantling the house, is strong evidence of his abandonment of it. If he was claiming it in good faith as his own; why did he delay to bring his suit for so many years, in the face of the fact that his father frequently informed him that he did not propose to let him have the property, but waited until his father's death before bringing it. The appellee contends that the evidence being conflicting, the case is brought within the rule of the case of *Doonan* v. *Glynn,* 28 W. Va. 715: "Where the decree sought to be reversed is based upon depositions, which are so conflicting and of such a doubtful and unsatisfactory character, that different minds and different judges might reasonably disagree as to the facts proven by them, the Appellate Court will decline to reverse the decree, though the testimony may be such that it might have pronounced a different decree, if it had acted upon the case in the first instance." I do not understand that a case of this character can be brought within that rule. In *Lorentz* v. *Lorentz,* 14 W. Va. 761, (Syl. point 2), it is held: "Such contracts before they can be enforced in a court of equity, must be established by competent and satisfactory proof, which must be

clear, definite, and certain." In this case the declarations of the old man Lorentz that he intended this for Catherine and her children, were more clearly proven than those of Martin Holsberry, and even proved by one witness that Lorentz had acknowledged a deed therefor before him, but it was not proved what became of it. In this case it was alleged that the elder Lorentz had agreed and promised to convey the land to his son's wife and children. Many delarations of Lorentz were proved that he intended to give the land to his son's wife and children; that he intended it for them; that he had made a deed to them, etc., but it was held insufficient to prove the contract. Plaintiff here doesn't allege in his bill that his father ever promised to convey the land to him, but that he "promised and assured plaintiff that the same should be and become his," and "advised and directed plaintiff to erect upon the same the buildings and fixtures hereinafter mentioned, with the assurance and promise to plaintiff that plaintiff's use and occupancy thereof, thereunder, should operate and vest title in plaintiff as fully and completely as if the same were vested in him by formal conveyance." There is no evidence except that of the plaintiff himself to support this allegation of the bill. When Martin Holsberry made a gift of the thirty-two acres which proved to be fifty acres, he conveyed the same to him by proper deed. It is strange indeed, if he ever intended to give him this land, that he would allow him to occupy it thirty years, and in the meantime make to him a conveyance of another tract adjoining it and not include both parcels in the same deed. Plaintiff was living on this thirty acres long prior to the time of the conveyance to him by his father of the fifty acres. This is one circumstance tending strongly to show that Martin did not intend to convey to Henry the thirty acres. Another is the location of the thirty acres, being right in the heart of his farm, and according to the evidence of several of the witnesses, such a division would be very injurious to the farm, and not such as would be likely to be made by any person owning the same. As stated by witness David Poling: "It would be the ruination of the farm. * * It would cut the farm right in two, and throw the building right at one edge. * * * It would take all of the water off of that end of the farm. * * * I would consider that it would nearly ruin that end of the farm." And William J. Poling, in his testimony, speaking of such division,

says: "I would not think it would be a division that any person owning the farm would be likely to make; I think it would be a damage to the rest of it on account of the water." In *Harrison* v. *Harrison,* 36 W. Va. 556, (Syl. pt. 3), it is held: "Where a son goes into possession of his father's land, and makes inexpensive improvements, it is not to be inferred therefrom, in the absence of other evidence, that the father gave the son the land. Neither are loose declarations of the father, without explanation, sufficient evidence of a gift. A contract between a parent and child, from the nature of the relation requires to be proved by a kind of evidence much stronger than that which might suffice between strangers. The evidence, in case, of a parol gift from father to child, should be direct, positive, express and unambiguous, and its terms clearly defined."

In treating of specific performance of oral contracts, Pom. on Con. (2nd Ed.) sec. 121 says: "The possession must be definite and exclusive; it must unequivocally show what land is possessed, and that it is possessed by the purchaser exclusively and not concurrently with the vendor; it must in short, indicate the commencement of a new interest or estate." *Miller* v. *Lorentz,* 39 W. Va. 160; *Gallagher* v. *Gallagher,* 31 W. Va. 9. There was no such definite exclusive possession in the case at bar. Many of the witnesses who worked for Martin Holsberry testify that he farmed the so-called disputed land the same as the rest of the farm, while Henry lived in the house; notably three of the Polings and Felix Skidmore. As between father and son the mere physical fact of possession is not of itself conclusive, nor even material. * * * For example the possession by a son of land belonging to his father, even when accompanied by valuable improvements, will not be treated as a part performance, because the relation between the parties prevents the inference which would otherwise arise from the fact, and removes all necessity of accounting for the possession by the supposition of an existing contract." Pom. on Con. sec. 116, and authorities there cited. As to the improvements placed upon the land by the plaintiff, the evidence as well as the circumstances show that they were placed there for the convenience of plaintiff while he should remain. The lumber was all taken from the home farm of Martin Holsberry, and the principal improvements, the repairing or remodeling of the dwelling house was put there after

Martin Holsberry had distinctly told him to build upon his own land; that he did not want a fine house put up there to pay taxes: upon, and further that he had given him all he intended to give him. It is further clear that plaintiff set up claim for improve-ments grossly in excess of what they cost. In his bill he alleges the cost of the house alone to be about $1,500, and in his testi-mony in chief at $1,888 for all the improvements. Then in re-buttal he testifies: "I have made an estimate. The amount is $2,138.98" and on cross-examination, in giving items in minute detail he made the whole when summed up amount to less than $500, which he said made a difference from his estimate of $1,638.98. On redirect examination on rebuttal, his attention was called to the cost of boarding hands which he said was not included and that he had estimated, that that item alone amount-ed to $250. It would seem that this item was about in keeping with his estimate of the whole at over $2,100. The workmen who put up the house and assisted in making the improvements put the cost at about what Henry Holsberry's itemized estimate on cross-examination made it. It cannot be inferred from the fact that Henry Holsberry was living upon the land and making small improvements for his own convenience, that the father had given him the land. The evidence in case of a parol gift from father to child should be direct, positive express and un-ambiguous, and its terms clearly defined. Loose declarations of the father without explanation, are not sufficient evidence of a gift. *Harrison* v. *Harrison, supra.* Improvements to the amount of $500 or $600 on real estate of the father occupied thirty years by the son by the sufferance of the father and the principal part of such improvements made after full notice that the father would not give him the land upon which the improvements were made, will not entitle the son to compensation for such improve-ments. It is contended that *laches* will bar plaintiff's claim for specific performance. Henry Holsberry abandoned or left the premises in 1895, the refusal of his father to give him the land had been prior to his repairing or remodeling the house, which was the greater part of the improvements made by him. His father lived until the 30th of October, 1902, more than seven years after Henry left the place; his cause of action, if any he had, existed long prior to his father's death. Plaintiff brought his suit within a very few weeks after the death of his father.

Why was it not brought in his life time?" The fair presumption is that he was not sure of his ability to overcome the defense that the father would interpose. So he would wait until his father's lips were sealed in death, and while this under the statute seals his own lips also as touching any personal transaction or communication between himself and his father, yet being a competent witness in some things involved in the cause, he hoped to be able to get down upon paper in his deposition in the cause, although under objections and exceptions, his version of the matter. In *Whilteker* v. *Improvement* Co. 34 W. Va. 217, (Syl. point 4), it is held: "The defense of *laches* may be made by demurrer, when the facts manifesting it appear in the bill." In *Phillips* v. *Coal Co.,* 53 W. Va. 543 (Syl. pt. 1): "A bill is bad on demurrer when it appears therefrom that there have been unreasonable delay and *laches* on the part of the complainant in asserting the rights which are sought to be enforced." Plaintiff in his bill alleges that he was placed in actual possession and control of the thirty acres in 1882 under the promise of the father that he would give him the land; and yet it was twenty years afterwards before he undertook to enforce his rights, and eight years of that time the same was in the exclusive control of his father. Point 2 of syllabus *Phllips* v. *Coal Co., supra,* holds: "A court of equity will not assist one who has slept upon his rights, and shows no excuse for his *laches* in asserting them." *Speidel* v. *Henrici,* 120 U. S. 377; *Trader* v. *Jarris,* 23 W. Va. 101; *Pusey* v. *Gardner,* 21 W. Va. 470, (syl. pt. 7); *Kelly* v. *McQuinn,* 42 W. Va. 774, (syl. pts. 2 and 3); *Bill* v. *Schilling,* 39 W. Va. 108.

For the reasons herein given, the decree complained of is reversed, annulled, and set aside and the plaintiff's bill dismissed.

*Reversed.*