# CHARLESTON

## WHITE *v.* WHITE.

### Submitted February 19, 1908.    Decided March 3, 1908.

1.  GIFTS—*Parol Gift of Land.*

    To establish an equitable title to land in a child, under a parol gift thereof by the parent, it is necessary to prove, by direct, unequivocal and clear evidence, the gift, identification of the subject matter as to location and quantity, notorious and exclusive possession thereof, and substantial improvement of the same.    (p. 31.)

2.  CONTRACTS—*Construction.*

    The significance of language used in a parol agreement always depends upon the situation of the parties at the time, their prior and subsequent conduct, the nature of the subject matter, the purposes they had in view and all the surrounding circumstances.    It sometimes means    more, and sometimes    less, than the words employed signify in their usual and ordinary acceptation.    (p. 31.)

3.  GIFT—*Parol Gift of Land.*

    Declarations and conduct of a father importing a gift of the home place by him to a son, on which both resided, it being all the land then owned by the former, are properly construed to mean only a gift of the use thereof and profits derived therefrom under a parol license, such as the cutting and marketing of timber, the retention of both possession and legal title by the father, and the substantial advantages incident thereto, being inconsistent with the theory of an absolute gift.    (p. 33.)

4.  DESCENT AND DISTRIBUTION—*Advancements.*

    A conveyance by a father of a portion of his land to one of his sons, by a deed reciting no consideration, practically contemporaneous with conveyances to other children, admittedly made by way of advancement out of his estate, is presumptively an advancement, and intended to be in lieu of the share in the land such son would have taken by partition on the death of the father intestate. (p. 38.)

5. APPEAL—*Reviews—Harmless Error—Ruling on Demurrer.*

A decree on a bill, omitting parties, necessary and proper, according to the allegations thereof, but who appear by the proof in the cause to have had no interest in the suit, will not be reversed for the error committed in the overruling of the demurrer, since the irregularity is merely formal and may be ignored in the interest of substantial justice. (p. 38.)

Appeal from Circuit Court, Logan County.

Bill by James H. White and another against A. B. White, L. C. White, and others. From the decree, A. B. and L. C. White appeal.

*Affirmed.  Remanded.*

ELLISON & ENGLAND, for appellants.

CHAFIN & BLAND and LILLY & SHREWSBURY, for appellees.

POFFENBARGER, PRESIDENT:

Claiming the equitable title to a portion of his father's estate in Logan county, under an alleged parol gift thereof, pursuant to which he had held possession of it for many years, and made improvements thereon, A.B. White has appealed from a decree, denying his alleged equitable title and appointing commissioners to make partition of the land, entered in a suit brought by other heirs of his ancestor. L. C. White, one of his brothers, was denied right of participation in the division, on the ground of an alleged advancement to him out of the ancestor's land by a conveyance to him of a certain portion thereof, and he also appealed.

In consideration of $2,500.00, Anthony Lawson and wife, on the 16th day of April, 1879, conveyed to James H. White, the ancestor of the parties to this suit, several tracts of land in the county of Logan, possession of which the grantee seems to have had long prior to that date, under a very general description, by which they were located on Buffalo Creek, and retained a vendor's lien to secure the payment of purchase money. On this land, the grantee reared a family of four sons and three daughters, A. B. White, Lewis C. White, J. N. White, F. M. White, Mary H. White, Minerva White, and Sarah White. Mary H. married L. A. Browning, Minerva married Oliver Riffe and Sarah married John Riffe.

The ancestor died in February, 1897, leaving surviving him F. M. White, J. N. White, Mary H. Browning, L. C. White and A. B. White. He had survived Minerva Riffe and Sarah Riffe. F. M. White died after the death of his father and before the institution of this suit, leaving a widow, Mary White, and six children surviving him, namely C. V. White, Cora J. White, Jennette Moore, Bertha Bland, Millard White and James A. White. Minerva Riffe seems to have left four children surviving her, two of whom, Hattie Glover and Addie Riffe, are named in the bill and others not. Sarah Riffe left, as surviving children, Rose Tremewan, Emory Riffe and Joseph Riffe. After the death of Minerva, her two unnamed children died without issue and their father, Oliver Riffe, inherited their shares. As the children of James M. White arrived at maturity and married, some of them were located on portions of this land. F. M. White settled on a part thereof known as the Bull Hollow land and remained there for a short period of time, three to five years, built a house on it and cleared some land, and, on his vacating the same, his brother, L. C. White, took possession of it, and it is said, paid F. M. White a certain amount of money for the improvements he had made. By a deed dated December 22, 1884, James M. White conveyed this land to L. C. White. On the same day, he executed a deed conveying to James N. White another part of his land. On the 16th day of January, 1885, he executed a deed conveying another portion thereof to John Riffe. Not less than 18 or 20 years ago, L. A. Browning and Mary H. Browning entered upon, and took possession of, another portion of it and have since resided thereon and made improvements. It does not appear that any provision was made for Minerva Riffe and her husband, nor for F. M. White. A. B. White, who, at the time his deposition was taken in the case, was fifty years old, remained at the home place with his father, claiming, as he now alleges, a gift of the same to him and made improvements thereon. This suit was brought by James A. White, one of the heirs of F. M. White, and Mary H. Browning, against A. B. White and all the other living descendants and heirs of James M. White. L. C. White's contention is that the land conveyed to him was not an advancement out of his father's estate. He claims it by purchase

from his brother, F. M. White, to whom he says it had been given by way of advancement. He seems to be contented with the present status of the land, since he does not allege any right of partition against A. B. White, and demands a share in the home place, the land in question, only on condition of failure of his brother's claim of title thereto.

The argument in support of the decree is predicated, for the most part, upon failure of proof of a parol gift and possession and expenditure of money under the same sufficient to take the case out of the statute of frauds; the contention being that the declarations of the ancestor to which the witnesses testify are too loose, indefinite and equivocal, viewed in the light of the situation of the parties, to indicate intention on his part to divest himself of the title; that the possession of himself and his son, A. B. White, was joint, and therefore in law, the possession of him who had the legal title; and that the improvements made upon the land, though valuable, were compensated by property and profits derived from the land.

The declarations relied upon are substantially as follows: J. M. Vance says J. M. White told him about the year 1872-73, while he resided with him as an employe, that he had given the home place to his son Becket (A. B. White,) and again, about the year 1880, when he visited him. Shortly before this last conversation, James M. White had married a second time. A. B. Burgess, about the year 1896, not long before the death of James M. White, went to purchase one hundred trees on the home place and was referred to A. B. White as the owner of the land, and a contract was executed between them under which he took the timber and presumably paid the purchase price to the son. C. L. Brown says he had more than one conversation with James M. White in which the latter told him he had given the land to his son. S. E. Ellis says he was referred to A. B. White as the owner of the land when he called upon him to buy some of it, but he did not purchase for the reason that subsequently he obtained another piece of land from a different person. Floyd Mullen testifies to another similar transaction about two years before the death of James M. White, in the course of which he says White said: "There is Becket, whatever he does is all right." John P. Vance says he heard White say at different times he intended to give his son, A. B. White, the home

place, and further that he, in company with one Thompson, applied to the former for a lease of the land for oil purposes, and, in response to the application, he says: "John P., I have not got any land to lease, I have given that to Becket," meaning the home place. "If you want a lease on that you will have to see Becket. I guess it will be all right with him." They made application to the son and the terms of the lease were settled with him, but it was signed by J. M. White, because he held the legal title. He fixes the time of the several declarations of intention between the years 1865 and 1870, while he lived near James M. White and worked for him. In point of fact, the land was jointly occupied by the father and son. Though the evidence is a little indefinite, it seems clear that each cultivated portions of it, but that the son exercised more extensive dominion over it than the father. The former married and reared a family on it and the latter made his home with him. A good many years before his death, James M. White married a second time and it seems he and his second wife, for a time at least, kept house separately from the son. Of the land cleared during the period of occupation by the appellant, a considerable portion was cleared by lessees for the use of the land. A. B. White himself cleared some, however, and witnesses say the clearing was worth fifteen dollars an acre. The lessees built several small houses for their own use, without cost to the lessor, which remain upon the land and constitute part of the improvements. Some buildings of considerable value were erected by A. B. White, but all from timber taken from the land. He no doubt contributed to the erection of these structures both labor and money, but, at the same time, he was deriving his support from the land itself, and besides, he sold some three or four hundred dollars worth of timber from the land. On the whole, it is plausibly contended by counsel for the appellees that he derived as much from the land as he added to it by way of improvements. He paid the taxes on it for a great many years. Another important fact is that the "home place" was not clearly defined until after the death of the ancestor. Not until then was the part now occupied by Mrs. Browning separated by a survey or otherwise from the part claimed by her brother.

The principles governing cases of this class have been well

settled for a long time by early Virginia decisions, binding upon this Court, as well as by our own. In *Miller* v. *Lorentz*, 39 W. Va. 160, 172, Judge Holt cites a very long list of them which goes back as far as 1794. Since the rendition of that decision, other cases have arisen, and, among them, *Holsberry* v. *Harris*, 56 W. Va. 320. All of them are uniform to the effect that the evidence of a parol gift must be direct and unequivocal and sufficient to clearly prove the contract, the subject matter of the gift, the land, clearly identified, the possession notorious and exclusive and the improvements substantial.

Generally the significance of language, verbal or written, depends upon the situation of the parties, their prior and subsequent conduct, the nature of the subject matter, the purposes they had in view and all the surrounding facts and circumstances. It sometimes means more and sometimes less than the words employed signify in their usual and ordinary acceptation. If nothing is found in the surrounding circumstances, disclosing a different intention, words are carried into effect in the sense in which they are generally understood, but variation in meaning is frequently seen in the language of written instruments; and, in cases of parol contracts, the attendant facts and circumstances and the conduct of the parties are almost always given in evidence along with the express language, to aid in determining what it means, and this, whether the terms employed are technical or non-technical.

All the declarations of the ancestor, to which the witnesses in this cause have testified, are susceptible of a qualified meaning. Though he did say to one witness he had given the land to his son, to another, the land belonged to his son, to another, it no longer belonged to him, and, to another, he was making his home with his son, he may not have meant or intended all these expressions literally import. In seeking his intention, it is not only permissible, but necessary, to inquire whether the literal import of the words harmonizes with the intent reflected by the conduct of the parties, their actual relative status and the purposes indicated by their acts. The ancestor had not given the land in the full sense of the terms. If he had made a gift at all it was an incomplete, unexecuted gift. By the promise of a gift, he had merely induced his son to so alter his position and circum-

stances as to render it inequitable and fraudulent on his own part to withold the promised donation.   He still retained in his own hands the legal title, and kept his foot actually on the land.   He had relinquished neither the legal title nor the possession.   He actually remained in the occupancy of the old homestead and the son continued to be an inmate thereof.   Though, by reason of the feebleness of the former, due to age and infirmity, and the superior strength of the latter, there may have been an apparent subordination of the will of the father to that of the son in respect to dominion over the household and the farm, it is not difficult to perceive that the latter may have been merely deputed by the former to act for him and so relieve him from cares and responsibilities, which in earlier years, it had been a pleasure to bear, but had now become heavy and burdensome beyond the strength of declining years.   Filial duty, regard and tenderness alone may have prompted the young man to take these burdens upon his own vigorous shoulders.   He was the youngest son, had grown up under the paternal roof, and could not depart from it, as his brothers had done, leaving others behind on whom the parent could lean for company, cheer and assistance, to which he had no doubt become well accustomed.   Continuation of joint occupancy of the land may well be attributed in part, at least, to adversion to the sundering of the family tie and the relation of mutual and reciprocal dependence subsisting between these parties for so many years.   The maintenance of this relationship did not preclude the son from pursuing his own personal interests.   There was ample land for the cultivation of both and the father was content with his support from the land and protection of the title by payment of the taxes, so that all the surplus income from their joint or several operations went to the son.   His parol license to the latter to cut and appropriate to his own use the timber justified his action in doing so, and still the father's title to the land remained in him unimpaired, and the *corpus* a weapon in his hands with which to drive the wolf from the door in the winter of old age, in the event of the death of the son or a possible disagreement between them, rendering the continuation of their friendly and mutually helpful arrangement impossible or undesirable.   To this extent and in this substantial sense, the land belonged to the son.   It

was his for the profit derived from cultivation, and sale of the timber and his for the purpose of managment and control, but not to the extent of power to make the parent an outcast in a cold and cheerless world, as would have been the case had the land been actually given to him. A gift subject to the right of support, or a conveyance subject to a reserved life estate would not have been nearly so advantageous, for much of the land was in a state of nature and unproductive and might remain so, wherefore, all the profits yielded by a life estate would not suffice to maintain a feeble and helpless old man, in case of the death or unfaithfulness of the son, contingencies which we may well assume were not overlooked. This was all the land he had left. There was nothing else upon which he could depend, in case of such possible eventualities. On the other hand, both contemplated inheritance of part of the land by the son, and a partition and allotment, equitable and just under all the circumstances, by which incidental benefits would be derived by the son from the improvements he was making. Advantage from them would certainly inure to all the prospective heirs and he would obtain, at least, his share of it. It was wholly unlike improvement of the land of a stranger, and radically different from notorious, and unequivocally exclusive occupation by a son of a portion of his father's land. Though he knew the benefit of these improvements would accrue jointly to him and the brothers and sisters and their descendants who share the inheritance with him, he may have considered himself fully compensated by the profits derived from the cultivation of the land and the marketing of timber therefrom.

In view of all this, the uncertain and equivocal character of those declarations, as well as that of the motive which led to the possession and improvoment of the land, is manifest. The evidence falls far short of clear proof of intention, on the part of the father, to part with the title, and, on the part of the son, to acquire it. The possession of the latter and all improvements made by him, are consistent and accordant with an hypothesis entirely different from that of equitable title to the land, and the case falls clearly within the principles and reasoning of *Holsberry* v. *Harris*, 56 W. Va. 320, *Miller* v. *Lorentz*, 39 W. Va. 160, *Gallagher* v. *Gallagher*,

31 W. Va. 9, and numerous other cases cited in the opinions in those we have just named.

Under some of these decisions, lack of exclusive possession of the land claimed constitutes an insuperable obstacle to the establishment of title on the theory of part performance of a parol contract, taking the case out of the statute of frauds. Another serious difficulty arises, respecting the identity of the land. No line was ever run, in the lifetime of the ancestor, between the part of the land claimed by A. B. White and the portion given to his sister, Mrs. Browning, according to his contention, for which reason there is an element of uncertainty as to the quantity of land alleged to have been given. *Miller* v. *Lorentz*, cited.

The deed to L. C. White recites no consideration, moving to the grantor, and none has been proven. It was made at about the same time others were executed for the purpose of effecting advancements out of the estate, and we are of the opinion that the court did not err in holding the conveyance to have been an advancement and denying said White's right of participation in the division. Conceding that he paid his brother for the land, the legal title was in the father. No conveyance had been made to the former, and no gift thereof to him is proven, except by the most remote and uncertain evidence. We are unable to see that he had an equitable title to dispose of. Besides this conveyance to L. C. White was practically contemporaneous with others, made to other children confessedly by way of advancement.

It is insisted that the demurrer should have been sustained because the bill alleges the death of two of the daughters after the death of the ancestor, and does not make the relicts of these women parties, since, under such circumstances, they would be entitled to estates by the curtesy in portions of the land. But the proof shows they died before their father did and so did not inherit any portion of his estate. We must assume that the court below would have allowed an amendment of the bill in this respect, on the hearing, if this variance had been brought to its attention, since such a simple amendment would plainly have wrought furtherance of substantial justice; and this Court may, in such a plain case, treat it as having been made. It may yet be made. It does not necessitate the bringing in of new parties

or call for any alteration of the decree. On the contrary, it justifies the omission of parties and makes the record conform to the decree. For cases sustaining this conclusion, see 1 Ency. Pl. & Pr. 581, 582.

Perceiving no error in the decree, we affirm it, and remand the cause for further proceedings.

*Affirmed. Remanded.*