# CHARLESTON.

## RACHEL SHORT v. JOHN PATTON.

### Submitted October 24, 1916.   Decided October 31, 1916.

1. GIFTS—*Inter Vivos—Evidence—Sufficiency.*
   To establish an equitable title to land in a child, under a parol gift thereof by the parent, it is necessary to prove, by direct, unequivocal and clear evidence, the gift, identification of the subject matter as to location and quantity, notorious and exclusive possession thereof, and substantial improvement of the same. (p. 182).

2. CONTRACTS—*Construction—Parol Agreement.*
   The significance of language used in a parol agreemnt always depends upon the situation of the parties at the time, their prior

and subsequent conduct, the nature of the subject matter, the purpose they had in view and all the surrounding circumstances. It sometimes means more, and sometimes less, than the words employed signify in their usual and ordinary acceptation. (p. 182).

3.. GIFTS—*Inter Vivos—Evidence—Sufficiency.*

Declarations and conduct of a father importing a gift of the home place by him to a son, on which both resided, it being all the land then- owned by the former, are properly construed to mean only a gift of the use thereof and profits derived therefrom under a parol license, such as the cutting and marketing of timber, the retention of both possession and written evidence of title by the father, and the substantial advantages incident thereto, being inconsistent with the theory of an absolute gift. (p. 182).

4. PARTITION—*Actions for Partition—Property Subject—Equitable Title.*

Land held by an equitable title only is a proper subject of partion by a suit in equity. (p. 187).

Appeal from Circuit Court, Roane County.

Bill in equity by Rachel Short against John Patton. From a decree for plaintiff, defendant appeals.

*Affirmed.*

*O. J. Chambers* and *Geo. F. Cunningham,* for appellant.

*Harper & Baker,* for appellee.

POFFENBARGER, JUDGE:

The decree appealed from, pronounced in a partition suit, involves a contest between a brother and a sister, concerning the title of a tract of land of which the latter claims their father died siezed and possessed. Her assertion of a one third interest in the land, as an heir of her father, is resisted by the brother, upon the theory of a parol purchase by him, of a portion of the land from their father, and of a like purchase of the residue, from another person. The heirs are three in number, one son and two daughters. One of the daughters brought this suit, making her brother and sister parties defendant. The sister of the plaintiff made no defense, but her brother, claiming all of the land, defended vigorously, and has appealed from the decree denying his contention as to the title.

The ancestor, William P. Patton, occupying, as lessee, a portion of a tract of land belonging to Benjamin H. Smith, and never having owned any real estate himself, on the 30th day of October 1874, purchased of Smith, not the leased land on which he resided, but another portion of his land, described as lying between Shadrick Ferrell's land and John Ferrell's land on the north side of Back Hays, (a creek), to the line of William Ferrell on the ridge between Hays and Back Hays. By a survey subsequently made, it has been ascertained that the tract of land so described contains 56 acres. The contract was in writing and provided that notes should be given for the purchase money, when the land should be surveyed, and that a vendor's lien to secure the same should be retained in the deed. The survey seems to have been made about two years later and it is the contention of the defendant John Patton that, when it was made, he, claiming to be the parol vendee of his father, desired an additional and adjoining tract of land out of the Smith holdings, which the surveyor who, he claims, was the agent of Smith, surveyed for him. The purchase price of the land was $5.00 an acre and the purchase money notes, dated Oct. 29, 1876, included much more than the purchase money of the 56 acre tract amounted to. It is conceded, in fact, that they covered the purchase money of both tracts, less the sum of $50.00 which seems to have been paid in cash. The entire boundary, the two tracts combined, was once surveyed as containing 78 acres, the purchase money of which would have been $390. The notes taken amounted to $340. As to whether Smith ever executed a deed conveying the land to William P. Patton, there is much conflict in the testimony. No such deed has been produced, but the sister swears most positively that her father had such a deed in his possession and that she saw it in a trunk belonging to her brother, after the death of her father. On the other hand, the brother denies, on his oath, that such deed was ever in his possession or among the papers of his father. His testimony on this point is supplemented by that of a niece who for some years, made her home with him, and says she, on more than one occasion, examined

79 W. Va.

the contents of her uncle's trunk and his papers, without having discovered such deed.

As the appellant's testimony aided by such other evidence as he has adduced, is clearly insufficient to sustain his contention, it is deemed unnecessary to enter upon any inquiry as to his competency as a witness or the admissibility of his testimony. The facts, as gathered from his evidence and that of all the other witnesses, utterly fail to establish title on the theory of a parol contract partly performed.

At the date of the original contract of purchase, the plaintiff was eighteen years old, her sister twenty, and her brother sixteen, and the home had not, in any way, been broken up. All continued to reside together with their father, until the older sister married, Sept. 9, 1880. For six years after her marriage, she resided in the neighborhood. The father died, March 10, 1885. After his death, the plaintiff, the son and their mother resided together on the farm, until August 1902 when the plaintiff married and left. Thereafter, the son and his mother continued to do so, until the death of the latter September 25, 1912. At the date of the purchase, the land was wild and uncleared. In 1875, a portion of it was cleared and a house erected thereon into which the family moved in the fall of that year. In 1878, the land, both tracts as one, was entered upon the land books, in the name of William P. Patton, and continued to be carried thereon in his name, until and including the year 1884. After that date, it was taxed in the name of John Patton, who claims to have paid all of the taxes assessed thereon, both in his own name and in the name of his father.

Though the son says he made the first clearing on the land and built the house, while his father and family, including himself, resided on the lease, it appears that he was then only a boy, without means with which to pay for the land, and dependent upon his mere capacity for labor, and that other members of the family were likewise contributing to the common support and advancement, by their labor. Before the land was surveyed and the purchase money notes executed, they were all living on the land and laboring together. The father was in ill health and unable to do as much work as the

son, it is true, but he did what he could, and all the witnesses admit that he performed some labor.

As to the alleged verbal contract of sale between the father and son, the evidence, other than that of the son, is very indefinite. His sister says there was such a contract, but not that she heard it made. She is unable to tell when or where it was made, or who was present. Her statement seems to be largely a conclusion drawn from circumstances. When asked how she could remember what the contents of the arrangement were, she said ''Because he, (meaning her brother), took the land and improved it and took care of father and mother as long as they lived.'' Four other witnesses testify to loose declarations made by the father, concerning his bad health, lack of strength, financial burdens and reliance upon the son for payment of the purchase money of the land, and they lay much stress upon his age and affliction. One of them said the elder Patton had told him that, if the land was paid for, it was John's; that John would have to pay for it, for he was not able to pay for it. Another says he told him he had contracted for the land, but did not know whether he would live to pay for it or not, but that he hoped John would; and added: ''If John pays for it, it is John's land.'' Another says she heard a conversation between her father and William Patton in which the latter said he had contracted for the land and would never be able to pay for it, but John would and it would be John's and that he had turned the land over to John. The fourth says he told him he was not able to work; that John was to take care of him and his wife; and that he had turned everything over to John. The son admits that all members of the family worked and did all they could, that the plaintiff worked both inside and outside of the house, and that he paid off the purchase money notes out of the proceeds of cattle sold off of the farm. He sets up the rather improbable claim that he became the head of the family at the age of sixteen years. Of course, he testifies to an express agreement that he was to have the land, in consideration of his remaining at home and paying for it. In fact, he makes this agreement ante-date the purchase, but neither sister remembers any formal agreement of the kind

and one of them emphatically denies it. The written evidence also contradicts it. The contract was taken in the name of the father, the notes executed by him, and the land assessed to him as long as he lived. Youthful foresight sufficient to provide an agreement of that kind might well have secured, or endeavored to secure, a written agreement within the six year period of his maturity occurring before the death of his father.

Though the forty acre tract was not included in the agreement of Oct. 30, 1874; that circumstance is not entitled to the weight claimed for it, in argument. The purchase money notes were executed by the father alone. Both tracts were paid for by the joint efforts of the family, in the name of the natural head thereof, and together constituted the homestead. Even though the son suggested the addition to the original purchase, it was not made in his name, and it is fair to assume that the father participated in the transaction. That he was known in it is beyond doubt, for he signed the notes.

If the parol contract was made and taken out of the statute by part-performance, the execution of a deed to the father would be immaterial. He could have parted with the legal title by a parol contract as well as the equitable. If proved, it would be a circumstance in evidence against the son, for procurement thereof would have been additional evidence of ownership in the father. Acceptance thereof would have been a later and further act of dominion over the property, on his part.

To the facts in this case the following observations made in *White* v. *White,* 64 W. Va. 30, 35, forcibly and conclusively apply: "All the declarations of the ancestor, to which the witnesses in this cause have testified, are susceptible of a qualified meaning. Though he did say to one witness he had given the land to his son, to another, the land belonged to his son, to another, it no longer belonged to him, and, to another, he was making his home with his son, he may not have meant or intended all these expressions literally import. In seeking his intention, it is not only permissible, but necessary, to inquire whether the literal import of the words harmonizes with the intent reflected by the conduct of the par-

ties, their actual relative status and the purposes indicated by their acts.· * * * * * He had relinquished neither the legal title nor the possession. He actually remained in the occupancy of the old homestead and the son continued to be an inmate thereof. Though, by reason of the feebleness of the former, due to age and infirmity, and the superior strength of the latter, there may have been an apparent subordination of the will of the father to that of the son in respect to dominion over the household and the farm, it is not difficult to perceive that the latter may have been merely deputed by the former to act for him and so relieve him from cares and responsibilities, which in earlier years, it had been a pleasure to bear, but had now become heavy and burdensome beyond the strength of declining years. Filial duty, regard and tenderness alone may have prompted the young man to take these burdens upon his own vigorous shoulders. * * * * * The maintenance of this relationship did not preclude the son from pursuing his own personal interests. There was ample land for the cultivation of both and the father was content with his support from the land and protection of the title by payment of the taxes, so that all the surplus income from their joint or several operations went to the son. His parol license to the latter to cut and appropriate to his own use the timber justified his action in doing so, and still the father's title to the land remained in him unimpaired, and the *corpus* a weapon in his hands with which to drive the wolf from the door in the winter of old age, in the event of the death of the son or a possible disagreement between them, rendering the continuation of their friendly and mutually helpful arrangement impossible or undesirable. To this extent and in this substantial sense, the land belonged to the son. It was his for the profit derived from cultivation and sale of the timber and his for the purpose of management and control, but not to the extent of power to make the parent an outcast in a cold and cheerless world, as would have been the case had the land been actually given to him. A gift subject to the right of support, or a conveyance subject to a reserved life estate would not have been nearly so advantageous, for much of the land was in a state of nature

and unproductive and might remain so, wherefore all the profits yielded by a life estate would not suffice to maintain a feeble and helpless old man, in case of the death or unfaithfulness of the son, contingencies which we may well assume were not overlooked. This was all the land he had left. There was nothing else upon which he could depend, in case of such possible eventualities. On the other hand, both contemplated inheritance of part of the land by the son, and a partition and allotment, equitable and just under all the circumstances, by which incidental benefits would be derived by the son from the improvements he was making. Advantage from them would certainly inure to all the prospective heirs and he would obtain, at least, his share of it. It was wholly unlike improvement of the land of a stranger, and radically different from notorious, and unequivocally exclusive occupation by a son of a portion of his father's land. Though he knew the benefit of these improvements would accrue jointly to him and the brothers and sisters and their descendants who share the inheritance with him, he may have considered himself fully compensated by the profits derived from the cultivation of the land and the marketing of timber therefrom.''

''In view of all this, the uncertain and equivocal character of those declarations, as well as that of the motive which led to the possession and improvement of the land, is manifest. The evidence falls far short of clear proof of intention, on the part of the father, to part with the title, and, on the part of the son, to acquire it. The possession of the latter and all improvements made by him, are consistent and accordant with an hypothesis entirely different from that of equitable title to the land, and the case falls clearly within the principles and reasoning of *Holsberry* v. *Harris,* 56 W. Va. 320; *Miller* v. *Lorentz,* 39 W. Va. 160; *Gallagher* v. *Gallagher,* 31 W. Va. 9, and numerous other cases cited in the opinions in those we have just named.''

Notorious and exclusive possession on the part of the vendee are, as a general rule, essential to right to specific performance of an oral contract of sale of land, *Galagher* v. *Gallagher,* 31 W. Va. 9; *Miller* v. *Lorentz,* 39 W. Va. 160;

*Holsberry* v. *Harris,* 56 W. Va. 320.    Under very peculiar circumstances, none of which are present here, an exception to this rule was recognized in *Bryson* v. *McShane,* 48 W. Va. 126.    There the service performed in consideration of the promise to convey the property was deemed to be sufficient part-performance of the contract to take it out of the statute, but this conclusion was based upon the peculiar nature of the service and the extraordinary circumstances attendant upon the performance thereof.    Nothing in the circumstances of this case can be deemed sufficient to take it out of the general rule.

That the title held in common is only an equitable one does not preclude right of partition by a bill in equity.    *Bissell* v. *Pierce,* 182 Ill. 60; *Johnson* v. *Filson,* 118 Ill. 219; 21 Am. & Eng. Ency. Law. 1156, citing numerous other authorities; Freeman Co. temancy & Par., sec. 439.    Failure of the plaintiff to set up a legal title, therefore, does not vitiate her bill nor forbid relief.

For the reasons stated, the decree will be affirmed.

*Affirmed.*