# CHARLESTON.

BRYSON *el ux. v.* McSHANE *et al.*

Decided April 21, 1900.

CONTRACT—*Specific Performance.*

An aged person, living alone in apparent destitution, without known friends or relatives, enters into a verbal contract with a husband and wife, whom she claims as kindred, to maintain, care for, support, clothe, and bury her, for her property, consisting of a small amount of personalty, and several pieces of real estate of inconsiderable value; and in pursuance of such contract they move into and take charge of her and her property, and in all respects possible fully carry out and comply with

their contract; but before the contemplated deed can be executed for such property, in consummation of such contract, she meets with an accident, which results in her death. At the instance of such husband and wife, a court of equity will specifically enforce such contract against persons asserting themselves to be heirs of the deceased by reason of remote relationship.

Appeal from Circuit Court, Tyler County.

Bill by David and Anna Bryson against Mary McShane and others. Judgment for plaintiffs, and defendants appeal.

*Modified.*

HOWARD & HANDLAN and JOHN J. CONIFF, for appellants.

J. V. BLAIR, for appellees.

DENT, JUDGE:

David and Anna Bryson, husband and wife, sue Mary McShane and others in the circuit court of Tyler County to compel specific performance of a verbal contract with Margaret Henrietta, deceased.

The facts are as follows: Margaret Henrietta was an aged Irish woman, past sixty. She owned in her own right several tracts of land and a house and lot situated in Moundsville. On one of her tracts of land she resided in a little old smoke house near her dwelling house thereon. This smoke house was nine or ten feet square made out of heavy split rail timber with a roof laid on it. It had no floor or flue. The occupant built a fire when needed in the center of the room, and permitted the smoke to pass out through a hole in the roof. Over some of the larger cracks some boards were nailed while the lesser ones were left open. It was destitute of furniture, and was not a fit abode for a human being. The dwelling house was occupied by a tenant and his family with whom this poor old woman would not live, because of ill feeling existing between them. She went filthy and shabby and often begged her food from the neighboring farmers, although she had an abundance to support her in good circumstances had it been properly managed. Her land had grown up with filth, and the fences had decayed and fallen down, while her tenants neglected her and looked only after their own interests. If she had any relatives they gave her no

attention whatever. Under these circumstances she went to Moundsville, and made a proposition to David and Anna Bryson, the latter of whom she said was her cousin or niece and nearest relative, that if they would move onto her farm and take care of her during the rest of her life she would deed them all her property. They accepted her proposition, gave up their business, which was keeping a boarding house, and moved down and took possession of the dwelling house, the tenant moving out, and took Margaret Henrietta in with them. From the evidence she surrendered to them full possession of all her property, and as she told the neighbors she intended now "to live like a lady." Mrs. Bryson took actual charge of the house and the old lady and cleaned her up and saw she had decent clothing. The neighbors testifying that from then on she was transformed in appearance and dress, and so continued until the day of her death. She repeatedly told them that she had turned her property over to the Brysons. No writings were drawn up, but the parties were waiting until the weather was suitable and then they were going to Middlebourne, the county seat, and have their contract put in proper legal form. The Brysons entered on the execution of their contract just before the holidays, and in the early spring when they were all fighting fire to prevent the burning of the fences the clothes of the old lady were in some way ignited, and before the flames could be extinglished she was so badly burned that in a few hours she died. The Brysons took her to Cameron and buried her beside her brother and sister in the Catholic cemetery according to her desire. They found that all her property had been returned delinquent and about to be sold for taxes, and redeemed it. They also paid other taxes on it. They paid all her doctor bills and funeral expenses, and in all respects fully complied with their contract. They had actual possession of the home farm by occupancy, and received just such possession of her other property as Margaret herself held. At least she continually, from the evidence of the witnesses, asserted that she had turned her property over to them, and that it belonged to them.

After her death, Mary McShane, claiming to be her neare : and only relative, being a cousin on her mother's side, as she asserted, and proves only by her own uncorroborated evidence, except some others claim to have heard James Henrietta, brother of Margaret, say as much, to-wit: that she was his nearest rela-

tive and his heir at his death, set up a claim to and endeavored to take possession of Margaret's property. In furtherance of this purpose she instituted a suit in ejectment against the Brysons. Thereupon they filed their bill to enforce their contract. On a hearing the circuit court decreed the plaintiffs all the property except the Moundsville house and lot, and this was left out for the reason that actual possession thereof was not shown by the Brysons. From this decree Mary McShane and Owen McShane, her son, who had at her instance been appointed administrator of her personal property and endeavored to take possession thereof, obtained this appeal.

They claim that the contract relied on is invalid by reason of the statute of frauds, and an insufficient description of the property sought to be covered thereby. The plaintiffs insist that full performance of the contract on their part takes it out of the statute of frauds and as all Margaret Henrietta's property was included no other description thereof was necessary. The last proposition is undoubtedly true, for if the contract included all the property owned by Margaret this is such description as can be made certain, and it need not be more specific. For it is a maxim of equity to regard that as certain which can be made so.

The uncontradicted evidence of the witnesses corroborated by the circumstances, the loneliness, wretched, friendless condition of Margaret, and the fact that she regarded Mrs. Bryson as her nearest relative and best friend, fully sustain this view of the contract. In the light of the testimony there can be but one conclusion, and this is that the plaintiffs were to have all her property. As shown by the tax receipts the value of it was not very great, and from the evidence few were anxious to enter into the bargain made by the plaintiffs. It would certainly be a great hardship on them to permit the statute of frauds to defeat them of their well earned reward.

The principal contention of the defendants is that the plaintiffs did not have such possession of the property as entitles them to specific performance. This seems to have been the view taken by the circuit court as to the house and lot in Moundsville. The evidence certainly shows that Margaret surrendered to them entire possession of the property, including herself. Possession means simply the owning or having a thing in one's own power. *Brown v. Volkening,* 64 N. Y. 80. It implies a present right to

deal with the property at pleasure and to exclude other persons from meddling with it. *Sullivan* v. *Sullivan,* 21 N. Y. 41. The plaintiffs could not occupy all the properties at one time, but they could enter into her possession which she gave them. There is no evidence showing that any one else had or claimed possession of any of the properties. In short their possession, such as she gave them, has never been successfully disputed. By their contract they were to have all the lands, but they could only actually occupy one of the properties, and this was the one at which their contract was to be fulfilled. In Devlin on Deeds, section 154, it is said that "Where a parol agreement is made for the sale of several lots of lands, and one gross sum is to be paid for the land as an entirety, taking possession of one of the lots would be sufficient." Specific performance can be enforced in a case of this character without regard to possession. In the case of *Brinton* v. *Van Cott,* 8 Utah 480, it is held that, "Where the part performance of oral agreement to convey lands consists in the performance of services of such a peculiar character that it is impossible to estimate their value by any pecuniary standard, the contract can be specifically performed, even though possession of the land agreed to be conveyed was never in the vendee." *Rhodes* v. *Rhodes,* 3 Sandf. Ch. 279; *Watson* v. *Mahan,* 20 Ind. 225. This is a rule generally accepted. Browne on the Statute of Frauds, section 463, Note 2. Some jurisdictions refuse to recognize it, notably Indiana. *Austin* v. *Davis,* 128 Ind. 472. This rule is but the general doctrine of equity that specific performance of a contract will be enforced where adequate compensation cannot be had at law, and that persons who contract to perform peculiar services for peculiar compensation, having performed such services, are entitled to have the compensation contracted for and to enforce a different value on their services and compel them to accept a less compensation for them, would be the perpetuation of fraud and injustice against them. There are some services that are incapable of valuation in money; as to these the law permits individuals to make their own contracts. Old age is naturally repulsive. The hair grows gray, the eyes sunken, the skin wrinkled and brown, the flesh shrunken, the figure bent, the limbs weak and trembling, the will feeble, the tongue garulous, the mouth toothless, the mind wandering, the habits careless and filthy, accompanied oftentimes with loathsome diseases needing all the care and attention of childhood

without its purity, loveliness and affection as a compensation. To meet this condition of life a kind Providence has ordinarily provided the ties of blood and marriage and parental, fraternal and filial affection with their reciprocal duties and obligations of mutual care and support. Where these are lacking through the want of near relatives the aged are compelled to endure great hardship and neglect, unless Christian charity noted for its rarity intervenes in their behalf. The condition in which Margaret Henrietta was living at the time she entered into her contract with the Brysons was not only a disgrace to her relatives, if she had any, but was a reproach to the community in which she resided, and the Christian fellowship of the denomination to which she adhered. She was thoroughly neglected. So much so that the witnesses testify that there were not many people who would be willing to take care of her for her property. The present claimants of her property undoubtedly holding their relationship in abeyance, if it existed, stood afar off waiting for her demise. These plaintiffs moved by her importunity and necessities, and recognized by her as her nearest kindred, came to her assistance and gave her the affectionate care of near relatives, so that her last days were a redemption from those which immediately preceded them. And now to deny them the compensation contracted for in favor of those whose relationship is not asserted, either by word or action, until death seals her lips forever, would be unjust and inequitable, contrary to her desire, and in violation of her expressed covenant.

The decree will therefore be modified so as to include the house and lot in Moundsville, and as thus amended, will be affirmed and the cause remanded.

BRANNON, JUDGE:

I doubt only as to the Moundsville property.