## KIMBALL *v.* BATLEY.

1. SPECIFIC PERFORMANCE—FRAUDS, STATUTE OF—ESTATES OF DE-
CEDENTS—EVIDENCE.

Evidence, tending to show a parol contract of decedent to con-
vey to complainant a farm in consideration of maintaining
decedent during his life, examined, and *held,* insufficient to
prove the alleged agreement or any acceptance of its terms
by complainant, or substantial performance of its conditions.[1]
MOORE, J., dissenting.

2. SAME—MUTUALITY.

A contract, to be specifically enforceable in equity, must be
binding on both parties alike, as to obligation and as to rem-
edy.

3. SAME.

On a bill to enforce specifically a parol contract to convey
land, not only must the proof of the contract be clear, but it
must establish a contract substantially as averred.

4. SAME.

Equity will not decree specific performance of a contract that
is uncertain.

5. SAME—EQUITY.

Even a binding contract will not be enforced specifically if it
is inequitable to grant the remedy.

Appeal from Ingham; Collingwood, J.    Submitted
October 18, 1912.  (Docket No. 161.)  Decided April 8,
1913.

Bill by Homer Kimball against Estella Batley and
others for specific performance of a parol contract to
convey lands.  From a decree for complainant, defend-
ants appeal.  Reversed.

[1] Specific performance of oral contract to devise or convey land
on consideration of performing services or furnishing support, where
no possession is taken or improvements made, see note in 38 L. R.
A. (N. S.) 752.

*Gardner & Hood,* for complainant.

*McArthur & Dunnebacke (Lawton T. Hemans,* of counsel), for defendants.

STONE, J. I am unable to agree with the result reached by Justice MOORE in this case. (1) It seems to me that the contract set forth in the bill of complaint has not been established by the evidence. (2) The evidence is not sufficient to show either acceptance or performance of the contract alleged by complainant. (3) Specific performance as prayed for is not equitable.

The bill of complaint, in the fourth paragraph thereof, states that in the month of February, 1908, while the decedent Stewart Scoville (the maternal grandfather of complainant) was residing with complainant's mother in Ingham county, and while complainant was residing and working at his trade in the city of Jackson, said Scoville went to the home of complainant and expressed a desire that he might live in the home of complainant, and proposed that if complainant and his family would move on the farm it question, and make the same their home, and work said farm and improve the same, and receive said Scoville into complainant's home, and care for and maintain and support him (said Scoville) during the remainder of his natural life, he (said Scoville) would give complainant, at the death of said Scoville, the farm, and that, at the death of the latter, complainant should become the owner of the premises.

In the fifth paragraph of the bill it is stated that complainant accepted the said proposal of said Scoville, and, in pursuance of the contract so made, moved, together with his wife and child, upon the farm; that decedent put complainant into possession of the same; and that complainant and his wife and child made the same their home, and worked said farm, and received decedent into their home and cared for, maintained, and supported him on said

farm during the remainder of his natural life, to wit, until July 20, 1908.

In the sixth paragraph it is stated that complainant moved onto said farm at considerable expense, and gave up his employment as a carpenter.

In the next paragraph it is alleged that in pursuance of said proposal and the acceptance thereof by complainant, and in full confidence that the said farm would belong to him, after the death of said Scoville, complainant expended large sums of money and much labor in making valuable, lasting, and permanent improvements upon said farm, and in repairing and improving the buildings thereon, and the walls of the house, and in remodeling the inside of the house, also in blasting and in removing from the fields of said farm many large stones thereon, and in building 80 rods of wire fence, and in otherwise improving said farm, at a large expense to complainant, all of which was done with the knowledge and approval of decedent.

In the eighth paragraph of the bill it is stated that, after the parties all moved onto the said farm, the said Scoville suffered a stroke of paralysis, rendering him very feeble and irritable and petulant at times, and in a condition which required great care; that complainant and his wife gave to decedent such care and attention as his condition required; that during the greater portion of the time succeeding said stroke of paralysis, and until his death, which occurred July 20, 1908, said Scoville required the constant attention of a man, and during the greater portion of the time complainant was his constant attendant; and that the care, time, and attention given to said decedent by complainant and his wife was worth a large sum of money.

1. Is this alleged contract established by the evidence? The mother of complainant testified that she went with decedent to Jackson in February, 1908, and that she there heard a talk between complainant and decedent. When asked on direct examination to relate the talk, she testified:

"He told him to move out there and make a home for him, and to live and board with them, and he would give them a deed of the place, after he was through with it. Before we made the trip in February, I wrote to Homer at my father's request. I wrote and told him that he had bought a place and he wanted him to come out there and live on it and make a home for him, and he would give the deed of it after he was through with it. At that time my son was living at Jackson and was doing carpenter work."

On cross-examination this witness testified that decedent continued to live with her until the following May; that she never told any one about this agreement until after this suit was begun; that her father was 86 years old when he died. Later in her cross-examination she testified that she had told of the agreement before this suit was begun, but she could not name any one she had told.

This was the only direct evidence of the alleged agreement. The other testimony on behalf of complainant, offered in support of the agreement, related to certain claimed admissions or casual statements of decedent made at different times, which are just as consistent with the position that decedent intended at some future time to give the farm to the complainant, as with the claim that there was an agreement *in præsenti* to convey it to complainant. In our opinion the evidence falls far short of proving the contract alleged. It should be borne in mind that this is not a claim against the estate of decedent for care and services rendered, but is a bill for the specific performance of an existing contract. *Wright* v. *Wright*, 31 Mich. 380; *Ritson* v. *Dodge*, 33 Mich. 463; *Smith* v. *Lull*, 152 Mich. 126 (115 N. W. 1002).

2. We are unable to find sufficient evidence in the record to show that there was any acceptance or performance of the terms of the alleged contract on the part of complainant. There is no evidence of any agreement on his part to perform, and no assent to the claimed proposition. It is true he moved onto the farm, but that of itself is not

sufficient performance, and is as consistent with the claim of defendants as that of complainant. There is no testimony, even by complainant, that he agreed to improve the farm or support decedent; and, upon the subject of performance, the evidence is very meager. Giving complainant's testimony its full probative force, it fails to make out a case, either of acceptance or performance of a contract, sufficient to warrant specific performance.

After testifying to his relationship to decedent when the latter died, and that complainant moved on the farm in April, 1908, and had resided there ever since, and, on cross-examination as to his residence and employment in Jackson, he further testified that he never paid any taxes on the farm, and never offered to pay any (this testimony was in August, 1910); that decedent had $18 and some cents in his possession when he died; that he was taken sick in June, and about the 1st of June decedent called a doctor, Dr. Brown of Stockbridge; that decedent always paid the doctor when he made his visits; witness did not know how much he paid him, but knew of his paying him the last $28; decedent paid that at noon before he died. Witness handed decedent $28 from the latter's pocketbook, which witness got out of the secretary; that there might have been $75 or $80 in that pocketbook during his sickness; that witness had not had access to the pocketbook for buying the things necessary for decedent; and that witness did buy alcohol and whisky for decedent. Then the following appears:

"*Q.* Where did you get the money from?

"*A.* Well, sir, after he handed me the pocketbook, I had it. He handed me the pocketbook, I think, about a week before he died. There was $71 or $72 in the pocketbook then.    *   *   *

"*Q.* What did you do with that $72?

"*A.* I think there was $2 spent for nightshirts and such things. There was some money spent for some eggs for him to eat; I don't know how much. I think I handed him $28 for the doctor. I paid Frank Beeman that same

noon.   I paid him $20.   [We gather from the record that Beeman helped care for decedent in his sickness.]   I think I have got the balance.   That was all paid out of this $72.

"*Q.* Had your grandfather let you have any other money during his sickness, or since you came out there?

"*A.* Well, he did give me $5 to get some change one time.   I think grandfather came to my place the forepart of May; I am sure he did.   *   *   *   I don't know whether my grandfather bought the fence material or not.   I didn't buy it.   I paid the gentleman who blasted the stone $7 and grandfather paid the $3.

"*Q.* Up to the time of your grandfather's death, had you done anything other than pay this $7?

"*A.* Why, I bought some lime, I think I paid 90 cents for that.   All I can remember that I paid out was $7.90 up to the time of grandfather's death.   Outside of Mr. Foster, I employed my father and brother on the farm before grandfather's death.   They helped me on the farm in farm work.   I built a fence.   I have made some improvements on the farm since the death of my grandfather.   I had to fix up a little fence once in a while; when it blows down or rots, you have to lay it up.   There was nothing beside that in particular.   I have had the entire proceeds of the farm since I was there.   I do not know what that amounted to.   During the time grandfather lived with me, I bought him no clothing.   I paid none of his doctor's bills; I paid for none of his nursing; I paid for none of his medicine; I paid none of his funeral bill; and he bought his own eggs.   I cared for him in the home; took care of him most of the time.   My wife did the washing and ironing and mending, and took care of his room at the home there.   My wife and I gave him the best possible care that was in our power.   I could not tell what mending I or my wife did for him.   I did some mending.

"*Q.* Now, there was some one there in attendance on your grandfather, wasn't there, all the time during his sickness?

"*A.* Not all the time; no, sir.

"*Q.* Practically all the time?

"*A.* Yes, sir.

"*Q.* Either his children or paid nurses were there every night?

"*A.* No, sir.

"*Q.* Practically every night?

"*A.* Yes, sir; but you understand that I was with him most of the time.

"*Q.* After he was taken sick, didn't the other members of the family come right in and assist in caring for him, the same as you did?

"*A.* Well, they were there; yes, sir."

John Foster testified that he worked on the 40 acres after Mr. Scoville bought the place; he blasted stones, trimmed the orchard, and built fences; that Mr. Scoville paid him for trimming the orchard after blasting stones and building the fences; witness went away when Mr. Scoville was not there; and it ran along two or three days, and witness saw him and he asked witness if complainant had paid him yet, and, being answered in the negative, decedent said, "Don't worry; Homer will pay you," and complainant did pay him; that, when decedent came after witness, he asked him to get the place fixed up in good shape so that complainant would be satisfied, and he said he had given the place to complainant.

It appears that decedent purchased the farm in question in the month of February, 1908, paying therefor $1,950. The foregoing testimony discloses substantially all that was done by complainant tending to show acceptance or performance of the alleged contract. Was complainant bound by the contract as proved? We think not. A contract, to be specifically enforceable in equity, should be binding on both parties alike, both as to obligation and remedy. *McMurtrie* v. *Bennette,* Har. Ch. (Mich.) 124–126; *Maynard* v. *Brown,* 41 Mich. 298 (2 N. W. 30); 26 Am. & Eng. Enc. Law (2d Ed.), p. 28, and cases cited.

On a bill for the specific performance of a parol contract for the conveyance of land, the contract must not only be clearly proved, but it must be substantially the same as set forth in the bill. *Wilson* v. *Wilson,* 6 Mich. 9; *Brown* v. *Brown,* 47 Mich. 378–384 (11 N. W. 205.)

Where the terms of the contract are uncertain, specific performance will not be decreed. 26 Am. & Eng. Enc. Law (2d Ed.), p. 59, and cases cited.

There is much force in the position of defendants that a prior will of decedent negatives the probabilities of such a contract as is claimed. Decedent had by his will substantially dealt equally with all of his children. Should the alleged contract be enforced, it would so deplete the assets that the terms of the will cannot be carried out. The conduct of complainant after the death of decedent was inconsistent with his present position, and leads us to believe that his present claim was an afterthought, and not in good faith.

3. To grant the relief prayed for by complainant would be inequitable. In *Chambers* v. *Livermore*, 15 Mich. 381–388, Justice COOLEY said:

"Specific performance, even of a binding contract, is not a matter of right; and a court of equity will refuse it, and turn the complainant over to his remedy at law, if not clearly satisfied that it embodies the real understanding of the parties."

See, also, *Smith* v. *Lawrence*, 15 Mich. 499; *Rust* v. *Conrad*, 47 Mich. 449-454 (11 N. W. 265, 41 Am. Rep. 720); *Blanchard* v. *Railroad Co.*, 31 Mich. 43 (18 Am. Rep. 142); *Wright* v. *Wright, supra*. In *Fowler* v. *De Lance*, 146 Mich. 630 (110 N. W. 41), complainants were denied specific performance in a case much stronger in its facts than is the instant case.

The decree below will be reversed, and the bill dismissed, with costs to defendants.

STEERE, C. J., and MCALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred with STONE, J.

MOORE, J. (*dissenting*). Complainant, on February 2, 1909, filed a bill for the specific performance of a contract which he claimed was made between himself and Stewart Scoville, deceased. The cause was heard and proofs taken in open court on the 2d day of August, 1910.

It is complainant's claim that while he was living in the city of Jackson, working at his trade as carpenter, Stewart Scoville, his grandfather, a man past 80 years of

age, came to his home and proposed that if he, Homer Kimball, would move with his family upon a certain 40 acres of land in the township of White Oak, Ingham county, more fully described in the bill of complaint, and would there maintain a home and care for said Stewart Scoville for the balance of his life, he (Scoville) would convey to him (Kimball) the property in question. He claims he accepted this offer and fully performed it upon his part. Defendants deny, as a matter of fact, that any such arrangement was made. They aver that, as a matter of law, if any parol agreement was made to convey real estate, it was void. It is also defendants' contention that, if any such arrangement was made, there was not a sufficient consideration, and a strict enforcement would be inequitable. The trial judge made a decree granting the prayer of the bill of complaint. The case is brought here by appeal.

Counsel for defendants contend as follows:

"(1) That the alleged oral agreement to convey to complainant the 40 acres of land in question has not been established by clear and convincing evidence as is required by law.

"(2) That by reason of the unexpected death of the deceased, but shortly after complainant moved onto the farm, and because of the fact that complainant did substantially nothing in pursuance to said alleged agreement, it is unconscionable and inequitable to decree specific performance of the same.

"(3) That complainant is himself in default with respect to the alleged contract, and that specific performance of the same cannot therefore be decreed."

1. A careful reading of the record shows that Mr. Stewart Scoville, the grandfather, was a widower and was not satisfied with the home he then had. He possessed property appraised at upwards of $9,000. The 40 acres of land he purchased cost $1,950. We have read with care the argument of counsel as to the degree of proof required to establish the contract which is sought to be enforced here. We have also noticed what is said about the will of the

deceased negativing the existence of the contract, and also what is said about the conduct of complainant and the conversation of the parties at the probate office at the time of reading the will, and the claim that complainant did not at that time claim the existence of any such contract. And the further argument that complainant permitted the real estate in question to be appraised as a part of the assets of the estate and negotiated for its purchase. There was hardly an important issue in the case in which there was not a sharp conflict in the testimony. It would profit no one to recite the testimony given in the case in detail. The complainant offered 26 witnesses in his behalf. Their testimony tended very strongly to make the case claimed by the complainant.

The defendant had five witnesses, all of whom, except one, had an interest in the litigation. 36 Cyc., at page 674, reads in part as follows:

"Care of Aged Person. A contract to care for, give personal attention to, and make a home for an aged person, whether a relative or a stranger, in return for a promise of a testamentary gift or devise, is a common form of such contract. If the performance of the contract involved the abandonment by plaintiff of his previous business or home, his equity is so much the stronger"— citing many cases.

In the first note occurs the following:

"There are some services that are incapable of valuation in money; as to these the law permits individuals to make their own contracts. Old age is naturally repulsive. The hair grows gray, the eyes sunken, the skin wrinkled and brown, the flesh shrunken, the figure bent, the limbs weak and trembling, the will feeble, the tongue garrulous, the mouth toothless, the mind wandering, the habits careless and filthy, accompanied oftentimes with loathsome diseases needing all the care and attention of childhood without its purity, loveliness, and affection as a compensation. To meet this condition of life a kind providence has ordinarily provided the ties of blood and marriage and parental, fraternal, and filial affection with their reciprocal duties and obligations of mutual care and support, etc.

*Bryson* v. *McShane*, 48 W. Va. 126, 130 (35 S. E. 848, 49 L. R. A. 527); *Best* v. *Gralapp*, 69 Neb. 811 (96 N. W. 641, 99 N. W. 837); *Vreeland* v. *Vreeland*, 53 N. J. Eq. 387 (32 Atl. 3). It is not essential, however, that the performance should involve a pecuniary sacrifice on plaintiff's part; the fact that he was previously in humble circumstances, so that the position was in itself advantageous, is not sufficient to warrant denial of relief. *Berg* v. *Moreau*, 199 Mo. 416, 438 (97 S. W. 901 [9 L. R. A. (N. S.) 157])."

At page 676 occurs the following:

"Duration of Services. It is immaterial that the services, on account of the death of the promisor, lasted only a few months instead of many years. But an agreement to make a testamentary gift in consideration of services will not be enforced until the services have been fully performed."

The questions involved are not new in this State. See *Lamb* v. *Hinman*, 46 Mich. 112 (6 N. W. 675, 8 N. W. 709); *Welch* v. *Whelpley*, 62 Mich. 15 (28 N. W. 744, 4 Am. St. Rep. 810); *Pike* v. *Pike*, 121 Mich. 170 (80 N. W. 5, 80 Am. St. Rep. 488), and the many cases there cited; *Ruch* v. *Ruch*, 159 Mich. 231 (124 N. W. 52); *Root* v. *Snyder*, 161 Mich. 200 (126 N. W. 206), and the many cases there cited. If we apply the principles of law to the testimony in this case, we think the trial court was quite right in finding that complainant had established his case.

The decree should be affirmed, with costs.