[No. 14045.  Department One.  October 19, 1917.]

E. B. VELIKANJE, *as Administrator etc., Appellant,* v.

HERMAN DICKMAN, JUNIOR, *Respondent.*[1]

WILLS—CONTRACT TO DEVISE—EVIDENCE—ADMISSIBILITY. Prior
conversations, while not competent to show an oral agreement dif-
ferent from a written contract, are admissible upon an issue as to
an oral agreement to devise real estate in consideration of services,
as tending to show a continuous grateful attitude upon the part of
the decedent.

WILLS—CONTRACT TO DEVISE—EVIDENCE—SUFFICIENCY. An oral
agreement to devise a ranch to the defendant, in consideration of
care, services, and nursing during the life of the decedent, who was
ill and required much help, is clearly established where many dis-
interested third persons of undoubted veracity testified to numer-
ous statements made by the decedent to the effect that defendant
was to have the land for his services, and the contract was certain
as to the parties, the property and the services, although not cer-
tain as to how the title was to pass, which was not essential.

WILLS—CONTRACT TO DEVISE—MERGER. The merger of an oral
agreement to devise land by the execution of a written contract for

[1]Reported in 168 Pac. 465.

its sale does not prevent a revival of the oral agreement or a new one to the same effect.

FRAUDS, STATUTE OF—CONTRACT TO DEVISE—PERFORMANCE. Where defendant fully performed his part of an oral agreement whereby decedent agreed to devise to him a ranch in consideration of services, care and nursing during decedent's life, the decedent could not repudiate the agreement just before his death; and it is not necessary to take the case out of the operation of the statute of frauds to show actual expenditures for improvements nor even possession of the property, where the consideration was personal care and services not measurable in money.

WILLS—CONTRACT TO DEVISE—CONSIDERATION. The short duration of services to be furnished during the life of the decedent in consideration of a contract to devise a ranch does not show their inadequacy to sustain specific performance, but the consideration is to be measured by the breadth of the undertaking rather than the eventuality.

Appeal from a judgment of the superior court for Yakima county, Grady, J., entered April 5, 1916, in favor of the defendant, in an action to cancel a contract for the sale of real estate, tried to the court. Affirmed.

*Wende & Taylor* and *E. B. Velikanje*, for appellant.

*H. J. Snively*, for respondent.

ELLIS, C. J.—On November 25, 1913, John Steinbrenner, since deceased, entered into a written contract with defendant for the sale of a twenty-acre ranch in Yakima county, Washington, and certain personal property thereon. Steinbrenner died testate on August 3, 1914. Plaintiff was appointed administrator of his estate with the will annexed. In the contract between Steinbrenner and defendant, the consideration named was $25,001, of which sum one dollar was paid by the purchaser as earnest money, the balance being payable in ten equal annual installments, beginning January 1, 1915, deferred payments to draw interest at six per cent per annum from date of contract. The purchaser was to pay all taxes and water assessments, keep the buildings insured, and care for the orchard. Time was of the essence

of the contract. The defendant having failed to pay the installment falling due on January 1, 1915, certain taxes and other charges, plaintiff gave notice on January 2, 1915, that he elected to declare the contract forfeited, and on January 16, 1915, brought this action to cancel it. Defendant, by answer, denied all material allegations of the complaint, except as to the death of Steinbrenner, and by cross-complaint alleged that, after the execution of the written contract, Steinbrenner and defendant entered into an oral agreement providing that, if defendant would remain with and care for decedent during his lifetime, the defendant should have, as compensation for his services, all of the property covered by the written contract; that defendant fully performed his portion of the oral contract and is entitled to a conveyance of the property. He prayed for a dismissal of the complaint with prejudice, for a cancellation of the written contract, and for specific performance. of the oral agreement. The allegations of the cross-complaint were traversed by reply. The cause was tried to the court without a jury. The court entered a decree dismissing the complaint and granting specific performance of the oral contract. Plaintiff appeals.

The dominant contention is that the decree is not sustained by competent evidence. Since every case of this character essentially rests upon its own facts, a resume of the evidence seems indispensable. Deceased was of German birth, but had lived in this country for many years. He was uneducated, spoke English brokenly, was rough and vulgar in language, very eccentric and extremely frugal, but was possessed of considerable natural intelligence and business ability. He was long a resident of Butte and Helena, Montana, and had accumulated considerable property in the saloon business and in mining and real estate. He never married. He was fond of young men, generally having one for an intimate associate. In 1912, he took a fancy to respondent, a young man then about twenty-three years of age, making him a

companion and calling him his nephew. Respondent was fitting himself for the profession of mining engineer, but, against his father's advice, was influenced by Steinbrenner to become a bartender. Steinbrenner proposed to start him in the saloon business, but to this his father would not consent. The intimate relations, however, continued, decedent saying to the father: "Let me have the boy and I will look after him; if he stays with me it will be to his advantage." At this time respondent began giving decedent electric massages on account of his impaired physical condition, and assisting him in looking after his affairs.

In the year 1909, decedent had acquired the ranch in Yakima county, Washington, which is here involved, and thereafter visited it from time to time, leaving respondent to attend to his affairs in Helena. The ranch had been sold by Steinbrenner under an executory contract, but he was compelled to take it back early in the year 1913 and run it himself. He urged respondent, both by letters and telegram, to come and help him. Respondent arrived in North Yakima on February 13, 1913, and immediately went to the ranch. There he and Steinbrenner lived together, respondent doing the ranch work, cooking the meals, shaving decedent, cutting his hair, and nursing him for a serious ailment. These duties often kept him occupied from four o'clock in the morning until midnight, and included personal attendance, massage and nursing of the most arduous, menial and repulsive nature. These services were continued until Thanksgiving day of that year, when Steinbrenner made a trip to Helena, whence he returned in June, 1914. Respondent's care and nursing were then resumed, and continued until the latter part of July, when the old man was removed to the hospital, where he died on August 3, 1914. That Steinbrenner valued the care and treatment of respondent is evident from a letter from Helena, dated February 6, 1914, in which he said: "As I told you in my last letter I got home safe, but miss the rubbing and the hot baths very much. I wished you were

here to do that again for me." And in April of that year he told a visitor from Yakima to Helena that he was going back to have respondent take care of him, as he could not get the care he wanted in Helena.

There is much evidence that, prior to the execution of the written contract of November 25, 1913, Steinbrenner treated the ranch as ultimately the property of respondent. In the latter part of March, 1913, in conversation with a neighbor, he remarked: "The boy is a good worker. The boy, he owns the ranch, or will get the ranch when I am gone." Respondent, hearing the remark, gave Steinbrenner his hand and thanked him. A real estate man testified that he approached Steinbrenner in September, 1914, evidently meaning 1913, regarding a sale of the ranch, and was told, "This property does not belong to me; I have given it to my nephew on the place, and we will talk the matter over and see you tomorrow." Steinbrenner usually referred to respondent as his nephew, though they were not related. The next morning the witness saw Steinbrenner and respondent together, when the former said, "The ranch does not belong to me; I have given it to my nephew Dick." The witness then remarked, "The place is not for sale then?" and was answered "No." Counsel on both sides understood the witness to refer to the year 1913, and so treated his testimony. Respondent's father visited him at the ranch in October, 1913, and on his arrival was greeted by the decedent with the remark, "I fix the boy up." The father asked, "In what does this fixing up consist?" and was answered, "Well, he has got the place now; I give him the farm." On the father's saying, "Well, how so? I don't see anything about it," Steinbrenner told respondent to bring him the deed and abstract. These he handed to respondent, saying:

"Here now, you have got the deed and abstract and the place is yours and nobody can take it away from you after I am dead, and you stay with me as long as I live."

Respondent took the deed and abstract and thanked Stein-brenner. He retained possession of this deed until after Steinbrenner's death. Later, after the witness had been shown over the place, Steinbrenner remarked, "I am a man of my word and I have kept it, what I have promised." To another witness, who remarked in August, 1913, that he had a good nephew to take care of his ranch, he said, "It wouldn't make any difference; he will get it anyway, some day; he deserves it." Though this evidence of prior conversations is not competent in itself to show an antecedent oral agreement different from the written contract, it is both competent and persuasive as showing a continuous grateful attitude on the part of the old man toward the youth, and throws much light upon his subsequent words and conduct. It furnishes strong support to the claim that he either made a new agreement with respondent or revived the old one to which the father testified, and that he never intended to enforce the written contract at all, and so led respondent to believe. Two days after executing that instrument, he told a neighbor, "I made this contract with the boy because I want to see what kind of a fellow he is, until I turn the property over to him." On the same day, he told another witness, "Mr. Dickman was to have the ranch and all there was on it for all he had ever done to me or for me so long as I live." To another neighbor he said:

"Now, I am selling the place to Herman and I am just charging him so much—a small amount each season—but when I die, it is all to go to him, and all the money he has paid on the place is all to come back to him. The place is his. I am giving the place to him."

On his trip to Helena in the winter of 1913, Steinbrenner met respondent's father and told him, "I come back and the boy is fixed now, and he done better than I ever expected him to. You can rest assured that everything is all right." The father asked, "Wasn't there a contract between you and him?" and Steinbrenner answered:

"Yes, there was a contract because I didn't know what the boy would do on the ranch, and how he would behave, or how he would take care of it, and what he would do, whether he would work or not, and I make that contract, that he don't get a swelled head having that farm in his hands; but that is neither here nor there, as long as I am living that will be considered as so far right, but as soon as I am dead he has got the property."

On February 6, 1914, Steinbrenner wrote respondent from Helena, saying:

"How is everything going on the ranch? . . . Well, just take care of everything in good shape and you will not lose anything by it; what you do you do for yourself and not for me as you know. I cannot take the ranch with me. Be a good boy and listen to the old man, and fix the pump on the well so you will have water for your horse and cow."

As late as June, 1914, Steinbrenner had a conversation with a Mrs. Newman in which she asked him why he did not deed the place to Dickman. "You say the ranch is going to be Dick's, why not deed it to him instead of giving him a contract?" and he answered, "Well, the contract is only a form; it doesn't really mean anything. I don't want to give him a deed right now to it, but it is his practically."

In addition to this testimony tending to show that the written contract of sale was meant only as a form and not as a binding contract, there is the testimony of a number of witnesses, some of which has already been indicated, that Steinbrenner always asserted that the ranch was to be respondent's for taking care of him. A Mrs. Biedebach testified:

"Mr. Steinbrenner told me that Mr. Dickman waited on him and sat up with him nights, and that he had earned and deserved the property. . . . About two weeks before he died he told me that Mr. Dickman was just the good boy he always was; that he expected to give him the place when he died; that he was the only person he was thinking of at all; that he was worth his weight in gold."

A Mrs. Brown testified that Steinbrenner repeatedly told her the ranch was to be respondent's and that the ranch was

his. A Mrs. Schlotfeldt testified that Steinbrenner said that he would give the place to Dick, that he did not need it and that he had plenty without it. Witness Robinson testified that decedent told him: "When I am through, Dick will have the ranch anyway." Witness Schlotfeldt testified that decedent told him at least twenty different times that the ranch belonged to Dickman. Witness Newman testified that, when decedent was quite ill, he asked him what he was going to do for Dickman if he died, and was told, "Well, I have taken care of him for his services, the services he has done for me, and the services he will do." On being asked if it was in writing, decedent answered, "That is all right, if I have got it in writing or not." To one De Kraay he said, "He is taking care of the ranch for me, and when I pass in my checks I will give the ranch to Mr. Dickman." Respondent's mother testified that decedent, in her presence, said:

"Well, boy, I know you are working awful hard, but what you are doing you are doing for yourself. When I go I can't take the ranch with me, and it will surely be yours. When I go you get the ranch, so you are taking care of it for yourself."

A few days before his death, Steinbrenner made his last will, making a specific bequest of $2,500 to one of his nieces and naming his nephew, Arthur L. Schimpf, who was already a man of wealth, as residuary legatee. There was no mention in the will of respondent nor of the Yakima county ranch. The will was drawn up by appellant as his attorney, who testified that he asked the decedent "if he was going to leave anything to Dickman, and he says, 'No, the God-damned ———,' and that was all he said in regard to Mr. Dickman." Property in Montana worth about $30,000 fell to Schimpf as residuary legatee, subject to the bequest to the niece.

The evidence in appellant's behalf tending to show that the written contract of sale was the only one recognized by

Steinbrenner as existing between him and respondent is main-
ly the testimony of appellant, who acted as the scrivener in
drawing up the contract, to the effect that Steinbrenner said
at the time that respondent would have to pay just the same
as anybody else.   A witness at whose house Steinbrenner
stopped on the visit to Helena testified that he gave her the
contract for safekeeping and told her he had let the ranch to
respondent for $2,500 a year, and that the latter was to pay
the taxes and water charges.   While stopping at her house,
Steinbrenner received a letter from respondent asking for $50
for spraying expenses, saying he would pay it back when he
got his income from the fruit, and the money was forwarded
by Steinbrenner with the remark "he would have to protect
his fruit."   On this same visit to Helena, Steinbrenner told
Schimpf that he had sold the ranch to Dickman for $25,000.
Respondent testified:

"Mr. Schimpf asked me how I was on the ranch, and what
agreement I had with John, and I told him at that time that
John sold me the ranch.   That is all I said, and he asked me
then if I had ever paid anything on it, and I told him that I
had, that the first year's crop was supposed to go in on it,
the year that John was there, and that was the understand-
ing."

The evidence also shows that, shortly after the death of
Steinbrenner, respondent said to appellant that, if John did
not leave him anything in the will, he would have a good, big,
stiff claim against the estate, as he had done for John what
he wouldn't do for any one else in the world.   Afterwards
the deed of the property handed him by the decedent was
turned over by respondent to appellant with the remark:  "I
will turn this over to you, Mr. Velikanje, until everything is
settled, and then you can give it back to me in case it comes
back to me by way of the will."   Subsequently, when appel-
lant demanded the property, respondent protested that the
place was his, that John had given it to him, and he was
going to fight for it.

The only improvements respondent was shown to have put on the place, in addition to his care of the orchard, was a pumping plant costing about $150. He built a shed and did some ditching, but this was done after Steinbrenner's death. While respondent was in possession, Steinbrenner had paid some of the taxes and water rates on the place, but the evidence showed that he was in the habit of giving the boy money whenever he was in need of it.

In considering this evidence it must be remembered that respondent was precluded by statute, Rem. Code, § 1211, from testifying as to any transaction between himself and the deceased. He could do no more than allege in his pleading the existence of the oral agreement. For proof of it he was forced to rely upon Steinbrenner's statements to third persons, construed in the light of all the circumstances, including his relations with the old man from their beginning. In weighing this evidence we are strongly impressed with the view of the trial court, who presumably knew the witnesses. He said:

"It is not necessary to repeat the numerous statements he made covering a long period of time to various parties whose veracity cannot be questioned, and these statements were so numerous and of such a character as to completely overbalance and counteract anything testified to the contrary by the witnesses who came from Montana in support of plaintiff's case."

Steinbrenner, though rough and unlettered, was possessed of much intelligence and apparently of a certain rugged honesty of purpose. He undoubtedly knew that respondent, a mere youth and penniless, could never hope to pay $25,000 for the ranch, pay the water rates and taxes, make necessary improvements and, at the same time, care for and nurse the old man in his declining years. His own words and conduct, both before and after the making of the written contract, show that he himself never entertained that expectation. That, prior to that time, he had agreed to give the ranch to

the boy in consideration of the boy's care and nursing during the rest of his life, seems to us too clearly established to admit of serious doubt.   True, if there were nothing more, that agreement would be held forever merged in the written contract.   But it does not follow that it was merged beyond revival, nor that a new one of the same character might not be made, and Steinbrenner's numerous subsequent statements and the boy's continued care and nursing seem to us wholly inconsistent with any other conclusion than that one or other of these things was actually done.   Unless Steinbrenner was deliberately trying to deceive the boy, his neighbors and friends and the boy's father by his numerous statements to the effect that the written contract was a mere form and that respondent was to have the land for his services in any event, he himself had never abandoned his original purpose. There is nothing in the evidence to justify such an aspersion on his character and motives.   At no time did he positively express a different purpose till almost the last day of his' life, and then to appellant in language uncalled for and wholly inconsistent with his prior utterances and conduct. At that time it was too late to change his intention.   Respondent had already performed his part of the agreement. *Best v. Gralapp*, 69 Neb. 811, 96 N. W. 641, 99 N. W. 837. Much is made of the fact that respondent, when questioned by Schimpf, referred his possession of the ranch to the written contract, but his testimony in the same connection shows that he then expected the ranch to be left him by the will. Weighing the evidence with the utmost care, we are convinced that it strongly preponderates in favor of the conclusion reached by the trial court.   The evidence of the existence of the exact agreement claimed was as clear and convincing as could ever be adduced where, as here, the lips of both parties are sealed, those of the one by death, of the other by the law.   The evidence was certain as to the parties, the property and the services to be rendered, but was not so certain as to how the title was to pass.   This last is not an essential.   A

promise to leave property in return for support or services need not specify how title is to pass. It is sufficient if an agreement is shown that the promisee shall receive the property, or that it shall be left to him at the decease of the promisor. *Best v. Gralapp, supra.*

It is next urged that, even conceding the oral agreement, there was no such performance on respondent's part as to take the case out of the statute of frauds. This claim is based on the fact that the improvements made by respondent were slight. It is true the element of actual expenditure for improvements is often invoked as a ground for specific performance of parol contracts to convey land, but it is neither the only, nor always an essential, ground. Even·possession of the property is not a requisite where the consideration was personal care and services not measurable in money. *Brinton v. Van Cott*, 8 Utah 480, 33 Pac. 218; *Schoonover v. Schoonover*, 86 Kan. 487, 121 Pac. 485, 38 L. R. A. (N. S.) 752, and note; *Bryson v. McShane*, 48 W. Va. 126, 35 S. E. 848, 49 L. R. A. 527; *Franklin v. Tuckerman*, 68 Iowa 572, 27 N. W. 759; see, also, note, 15 L. R. A. (N. S.), p. 466 *et seq.*

Here the making of improvements was not the moving consideration for the contract, but the promise to care for the old man so long as he lived. That this promise was scrupulously fulfilled was shown by ample evidence, even to disgusting details. While it is generally held that the mere payment of the consideration is not sufficient performance to take a parol agreement for the purchase of land from under the ban of the statute, the application of that rule to such a case as this would be palpably iniquitous. Services such as both parties must have known the agreement would entail, and such as were actually performed, the duration of which was to be for the uncertain period of the recipient's life, are not measurable in money. To remit respondent to the impossible task of recovering their money equivalent in an action at law

would be grossly inequitable. As said in a case closely parallel on the facts:

"Money was not made the standard by which to measure the value of such care and attention as his pitiable condition would be likely to require for a period as uncertain as the duration of his life, and his intention to convey the premises in consideration therefor should, in the absence of fraud or injury to anyone, govern the action of the court. The case is clearly within the rule justifying courts of equity, in carrying into effect parol agreements, to convey real estate, after the full and faithful performance of such service in consideration therefor, as this record discloses." *Lothrop v. Marble*, 12 S. D. 511, 81 N. W. 885, 76 Am. St. 626.

See, also, *Howe v. Watson*, 179 Mass. 30, 60 N. E. 415; *Rhodes v. Rhodes*, 3 Sanf. Ch. (N. Y.) 279; *Bryson v. McShane*, 48 W. Va. 126, 35 S. E. 848, 49 L. R. A. 527; *Warner v. Marshall*, 166 Ind. 88, 75 N. E. 582; *Brinton v. Van Cott, supra; Fred v. Asbury*, 105 Ark. 494, 152 S. W. 155; *Hall v. Gilman*, 77 App. Div. 458, 79 N. Y. Supp. 303; *Le Vie v. Fenlon*, 39 Misc. Rep. 265, 79 N. Y. Supp. 496; *McCullom v. Mackrell*, 13 S. D. 262, 83 N. W. 255; *Barry v. Beamer*, 8 Cal. App. 200, 96 Pac. 373; *Schoonover v. Schoonover, supra; Brown v. Sutton*, 129 U. S. 238.

Finally, it is argued that, in view of the short duration of respondent's services, they are inadequate as a consideration to sustain specific performance. But the extent of the consideration is to be measured by the breadth of the undertaking, rather than by the eventuality. Respondent might have had to serve and nurse for many years. Each party to the agreement knowingly stood to lose or gain by that contingency. As said by the supreme court of Indiana in *Warner v. Marshall, supra:*

"But . . . the extent of the consideration, there having been performance, should be measured by the breadth of appellant's undertaking, rather than the fact that the actual service was only for about three and one-half years. There are no circumstances of overreaching or even of hardship in

the case. It was decedent's own proposal. She could not take her property with her, and she procured by her agreement a loving service that she stood greatly in need of."

See, also, in this connection, *Howe v. Watson* and *Bryson v. McShane, supra; Woods v. Dunn,* 81 Ore. 457, 159 Pac. 1158.

In the making of the oral agreement here involved there is no element of overreaching. Manifestly, of the two contracting parties, Steinbrenner possessed the dominating character. The proposal was his own. The enforcement of the agreement entails no hardship on any one. To refuse to enforce it would work a hardship on the boy, who has abandoned his contemplated scheme of life by reason of the old man's promises.

The decree is affirmed.

MORRIS, CHADWICK, and MAIN, JJ., concur.

WEBSTER, J., took no part.