### BAILEY v. BAILEY.

1. TRUSTS—EXPRESS TRUST—IMPLIED TRUST—EVIDENCE.
   In plaintiff's suit against the other heirs of his mother to impress a trust upon the record title of certain real estate she had devised to defendant brother, record *held*, to contain no proof of an express trust nor of facts or circumstances from which a trust might be implied.

2. SAME—CONSTRUCTIVE TRUST—FIDUCIARY.
   In plaintiff's suit against the other heirs of his mother to impress a constructive trust upon the record title of real estate she had devised to his brother, where there was no agency or fiduciary relationship shown to have existed between plaintiff and his mother under, by virtue of, or in relation to, which she had acquired title to the real estate, the mere fact that she had

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 54 Am. Jur., Trusts, § 30 *et seq.*
[2] 54 Am. Jur., Trusts, §§ 218–247.
[3–7] 57 Am. Jur., Wills, § 192 *et seq.*
[3–7] Decedent's agreement to devise property as compensation for services. 69 A.L.R. 14; 106 A.L.R. 742.
[3] 49 Am. Jur., Specific Performance, § 21.
[4–7] 57 Am. Jur., Wills, § 185.

left her property to someone less deserving of her bounty than plaintiff and he was entitled to compensation for services rendered would not entitle him to impress a constructive trust upon such property.

3. EQUITY—TRUSTS—SPECIFIC PERFORMANCE—ORAL AGREEMENT.

An oral agreement entered into between a son and his mother after the father's death that if the son would stay on the farm and help raise the younger children, the farm would belong to him, if dishonored by the mother would relegate plaintiff to the remedy of specific performance rather than the imposition of either an express, implied, constructive, or resulting trust.

4. SPECIFIC PERFORMANCE—PARENT'S ORAL CONTRACT TO LEAVE REAL ESTATE TO A PARTICULAR CHILD—EVIDENCE.

Testimony tending to establish nothing more than a parent's unexecuted intention to leave real estate to a particular child in return for services rendered and to be rendered by such child *held,* insufficient to establish a contract to that effect which may be specifically enforced.

5. SAME—CONTRACTS—BURDEN OF PROOF.

To authorize a decree for specific performance, there must be a contract to enforce, and the burden is on those who seek such relief to establish such contract.

6. SAME—CONTRACTS—EVIDENCE—UNEXECUTED INTENTION.

Proof of an unexecuted intention to leave property by will or otherwise is insufficient to warrant a decree of specific performance as a contract must be proved.

7. SAME—ORAL CONTRACT TO LEAVE FARM TO CHILD—EVIDENCE.

In plaintiff's suit against remainder of his mother's heirs for specific performance of her alleged oral contract to leave him farm in return for staying thereon after father's death and helping her care for the younger boys, evidence *held,* insufficient to sustain burden of proving the claimed agreement on the part of the mother.

Appeal from Jackson; Jacobs (Theo. T.), J., presiding. Submitted January 6, 1948. (Docket No. 7, Calendar No. 43,728.) Decided May 18, 1948.

Bill by Thomas H. Bailey against Eugene J. Bailey and others to impress a trust upon real es-

tate.   Decree for defendants.   Plaintiff appeals.
Affirmed.

*John S. Denton,* for plaintiff.

*H. A. Kinch,* for defendant.

Dethmers, J.   Plaintiff filed his bill of complaint
to "impress a trust, either express, implied, con-
structive or resulting, as the court shall find, upon
the record title" of certain real estate or to secure
specific performance of a claimed oral agreement
"whereby this plaintiff was to receive the legal title
to the premises."   From decree dismissing his bill
of complaint, plaintiff appeals.

In 1909, plaintiff's mother, Anna J. Bailey, owned
the farm property here involved.   Her husband died
leaving her with four minor children, the plaintiff,
Tom Bailey, then 16 years of age, defendant Fran-
ces, age 18, defendant Eugene, age 7, and William,
age 4, now deceased, of whom the remaining defend-
ants are the heirs at law.   The farm was then en-
cumbered by two mortgages, the principal sums of
which totaled $1,700.   Her brother, Thomas Chit-
tick, a wealthy man residing in the State of New
York, attended the husband's funeral.   It is the
plaintiff's claim that on the following day an oral
agreement was made and entered into by and be-
tween plaintiff, his mother and his uncle, Mr. Chit-
tick, under which plaintiff agreed to stay at home,
work the farm and support and care for his mother
and the rest of the family, in consideration of which
his mother agreed to give him the farm and his uncle
agreed to buy the mortgages and give them to him.
Plaintiff takes no definite position as to the time
when either of these gifts were to be consummated.
It is undisputed that plaintiff did stay on the farm
and do everything which he claims constituted the

obligations assumed by him under the alleged agreement. The mother never gave the farm to plaintiff in her lifetime and died in 1944, leaving the farm by will to her son, defendant Eugene Bailey, and making provision for the plaintiff only as follows:

"Second: I give and bequeath unto my son, Thomas H. Bailey, the sum of $100.00 and I hereby state that one of the reasons why I do not make a larger provision for him herein is the fact that he has lived on, and had the use of my farm in Henrietta township, said county and State, since approximately the year 1915, and I am, therefore, of the opinion, right or wrong, that he has had more than his share of my bounty during my lifetime."

For the light that it may shed on her reasons for making but such scant provision for her son, Tom, under the circumstances, it is worthy of note that a bank employee testified that Tom had forged some checks on his mother's account; that this fact "hurt her quite bad;" that she said she did not want it brought out and she would take care of it herself; that she said "she would still give Tom a home as long as she lived, and he was her son and she was going to do right by him."

Chittick bought and secured assignments of the two mortgages to himself and never required payment of the principal or interest thereon. He died in 1922, leaving a will which made no mention of the mortgages. His executor caused suit to be commenced in chancery for their foreclosure. Plaintiff, Thomas H. Bailey, intervened in the suit, filing a bill in which he alleged the following:

"The said Thomas H. Chittick discussed the matter with the intervenor, told him about the two mortgages resting upon the farm and said to him in substance: 'If you will stay at home and help your mother on the place and help her take care of the other children, I will buy those two mortgages and

give them to you' and intervenor then and there agreed with his said uncle, in consideration of his uncle's promise, that he would do as requested."

The foreclosure suit proceeded to trial, but before its conclusion a settlement was reached under the terms of which Thomas Bailey withdrew his claim to the mortgages and the Chittick estate accepted from plaintiff's mother, Anna Bailey, the sum of $1,937, by deduction of that amount from a legacy left her by Chittick, in full settlement of the mortgage indebtedness then totaling about $3,500.

In the course of the foreclosure proceedings Anna Bailey testified in support of her son Thomas's claim that the mortgages were rightfully his and ought not to be foreclosed by the Chittick estate. Plaintiff relies, in part, upon that testimony to establish his alleged oral agreement with her upon which this suit is founded. The portions of her testimony stressed by counsel are as follows:

"I had a conversation with my brother when he came to the funeral. It was about the first that we talked just before he left. He said, 'Now, Anne, I'm going to start for home; I feel that you are up against a hard problem.' I said, 'I don't think—' He says, 'I want you to stay on this farm.' I said, 'I don't think I can stay on this farm under such a debt,' and he said, 'I have just had a heart-to-heart talk with Thomas.'

" 'I want Thomas to have this farm,' and he says, 'I will do everything that I can for him and you know my address. If you need anything, you can let me know.' I said, 'I never can pay the mortgages on this farm,' and he said, 'I will assume these mortgages.' That is what he said to me. He said, 'I want Thomas to have the farm, if he will stay here and take care of the family and take care of these boys and raise them men and not tramps.' He said that he says, 'I will assume these mortgages, and I want Tom to have this farm,' and he never men-

tioned the mortgages nor the interest to me after that. My brother said he would assume those mortgages and he wanted Tom to have the farm, and all was right for him to have the farm. * * *

"He always advised me to stay on that farm because he wanted Tom to have the farm. He said that to me every time I saw him. He said he didn't want me to leave the farm. I had opportunities to trade the farm for city property and like that, and I would always write to him about that to ask if he thought best what I should do. He always advised me to stay on that farm. I think I have told you everything, all the conversation I ever had with my brother concerning my son Thomas and this farm and these mortgages. * * * I understand the situation here now is that my son, Thomas, is asking for these mortgages, asking that the mortgages be foreclosed now in his name so he can have the money or the farm. I understand that. I think he has well earned it. I think he has furnished a great deal more than he got. * * * After this conversation with my brother I ceased to worry about these mortgages entirely, because that is what he told me, that he wanted—that he would assume those mortgages and he wanted my son, Thomas, to have the farm. * * * My brother assumed these mortgages and I didn't think that it was his intention of ever making me any trouble about them or ever asking for the principal or the interest. He never did. He was going to let me have the mortgages. I thought that that was his intention. I thought that was his intention that he wanted Tom to have that farm and that he assumed the mortgages willingly and never made us any trouble. He paid the mortgages, or he assumed them—took the mortgages, and the whole family could have the benefit. * * *

"It was understood with my brother that I would never have to pay these mortgages * * * I don't think that my brother ever intended to make us any trouble, I think he intended to give it to us.

"*The Court:* If he intended to give it to you, then your son has no right to take it and foreclose it, has he?

"*A.* Yes, because my brother wanted him to have that farm.

"*The Court:* But I know; he could have the farm if the mortgage was not collected, couldn't he?

"*A.* Well—I don't know.

"*The Court:* You see your brother did not own the farm and could not give the farm to your son.

"*A.* Well —

"*The Court:* You would have to do that.

"*A.* Yes, well —

"*The Court:* You would have to give the farm to your son.

"*A.* Well —

"*The Court:* Did your brother ever ask you to deed the farm to your son?

"*A.* Yes, he asked me; he said to me—he says, 'Annie, I want Tom to have that farm,' and he said that he thought he had earned it, and that he had done well.

"*The Court:* Then, if he had given you the mortgages and you had given Tom the farm that would have been all there was to it.

"*A.* It would have been settled up. I would not have had—he would not want to give him the farm with all these mortgages on.

"*The Court:* If your brother wanted to wipe out these mortgages—

"*A.* Yes.

"*The Court:* — Your son hasn't got anything here to foreclose.

"*A.* Well, I don't know about that; I don't know.
* * *

"*The Court:* Have you had any talk with your son along this line, that if he should prevail and be found out to be the owner of the mortgage that instead of him foreclosing it you would give him the deed to that farm?

"*A.* Why, yes, when I — I would want him to have the farm; I want him to have the farm clear.

"*The Court:* Have you and he talked that?

"*A.* No, we have never said very much about it until this came up that they were going to foreclose.

"*The Court:* Now, you understand in this suit, if your son should get what he is asking to get, he would take the place of Mr. Simpson and go right on and foreclose that mortgage and sell that farm. You understand that?

"*A.* Yes.

"*The Court:* You could save all that by your deeding it to him; would not be any necessity of making the expense of a sale and a foreclosure. For your son to get the farm, you could deed it to him. Did you ever talk about it with your son?

"*A.* No, I never have, no.

"*The Court:* Why didn't you intervene here and simply claim that the mortgage was never intended to be collected, that your uncle (brother) intended to give it to you?

"*A.* Well, I knew that he did intend to give it to me. Then, when I talked with my brother, and he said that he wanted Tom to have the farm, why he wanted me to do as he wanted me to.

"*The Court:* Did he ever say he wanted Tom to have these mortgages?

"*A.* He said he would take care of that; I supposed that he did, the [that?] he would, yes. \* \* \* I never took the position to either Mr. Hermans or Mr. Hubbard that my son, Thomas, owned these mortgages. I said that my brother had taken these mortgages, that my brother had the mortgages, that Tom didn't own them, my son, Tom. \* \* \* I don't know when I first made the claim that these mortgages belong to Tom. I know I wanted Tom to be paid for his services there. \* \* \*

"*Q.* Now, your understanding from your talk with your brother, after he had had his heart-to-heart talk with Tom was that Tom was to stay there and raise the children?

"*A.* Help raise; do everything there that he could do to raise the family and take care of us. He has done that.

"*Q.* When these children were raised, he should have these mortgages?

"*A.* Yes, I supposed he would; I supposed that he would wipe them right out.

"I never called my brother's attention to the fact that these mortgages had not been turned over to Tom."

In the instant suit, plaintiff's sister, defendant Frances McConomy, testified in his behalf in part as follows:

"I remember that the day after the funeral my mother and my uncle were in what we called then the parlor bedroom having a long talk. And later —later, when mother came out—of course I was very much interested in mother and the boys. I asked her what he was going to do for us, and she —she told me that she had had the talk with her brother, that — that we were to remain on the farm, at least she and the boys were, and that Tom was to help to make a home and take care of the boys, and that he would have the farm. Mother told me those things. And, of course, it relieved my mind greatly. Also, she did mention he was going to take care of the mortgages.   *   *   *

"*Q.* That your uncle, Mr. Chittick, was to see to it that Tom got the farm by buying up these two mortgages, paying for them, and then turning them over to Tom?

"*A.* That was my understanding.   *   *   *

"*Q.* Mrs. McConomy, you stated this morning on direct examination, I believe, that your mother told you that Tom was to have the farm. Now, do you remember anything else that she said at that time as far as any reasons for making that statement?

"*A.* Well, the reason that she made the statement was that Tom was to remain on the farm and work the farm and take care of her and the younger boys. In other words, make a home for the family."

The above testimony of plaintiff's mother and sister constitutes the whole of the direct proofs introduced by plaintiff for the purpose of establishing the alleged oral agreement between himself and his mother and uncle.

At the outset of the hearing before the trial court plaintiff's counsel assented to the court's statement that plaintiff's "theory is, in substance, that there was a parole agreement that the title should belong to Thomas H. Bailey," plaintiff's counsel stating that "the various theories upon which the plaintiff claims that he is entitled to the conveyance of that property, it being the constructive trust, the express trust, and also the basis of specific performance on an oral agreement."

There is no proof of an express trust nor of facts or circumstances from which one might be implied.

In support of his constructive trust theory plaintiff leans heavily on *Stephenson* v. *Golden,* 279 Mich. 710, as well as on *Weir* v. *Union Trust Co.,* 188 Mich. 452, and *Ryan* v. *Chopp,* 314 Mich. 255. But, as distinguished therefrom, in the case at bar no agency or fiduciary relationship was shown to have existed between plaintiff and his mother under, or by virtue of, or in relation to which she acquired title to the real estate. Even if plaintiff be fully entitled to compensation for services rendered for his mother, and deserving though he may be of her bounty, equity has not yet extended itself to the point of impressing a constructive trust on her real estate in favor of plaintiff merely because she left those services unrequited and her estate to another less deserving.

Plaintiff's sole pretense to any right to the property stems from a claimed agreement entered into at a time when his mother already owned the premises. If such agreement were made and dishonored by his

mother, plaintiff's remedy, at most, would rest in specific performance.

Has plaintiff proved an oral agreement with his mother by which she promised to give, deed or devise the property to him at some unspecified time? Plaintiff's sister testified that his mother told her that Tom "would have the farm." The sister also testified that from her conversation with her mother it was her understanding that "Chittick was to see to it that Tom got the farm by buying up those two mortgages, paying for them, and then turning them over to Tom." The mother's relevant testimony amounts to about this: That her brother, Chittick, wanted Tom to have the farm; that at the time of the foreclosure proceedings, some 15 years after the alleged agreement, she wanted Tom to have the farm clear; that "I know I wanted Tom to be paid for his services there;" that she had understood her brother, Chittick, was going to give the mortgages to Tom. Never did she testify nor tell plaintiff's sister that she had promised or agreed to give the farm to Tom, nor that she intended to do so in the future. Viewed in the light most favorable to plaintiff, the statements made by his mother to his sister or as a witness in the foreclosure proceedings are, at best, as this Court said of similar testimony in *Kimball* v. *Batley,* 174 Mich. 544:

"Just as consistent with the position that decedent intended at some future time to give the farm to the complainant, as with the claim that there was an agreement *in praesenti* to convey it to complainant. In our opinion the evidence falls far short of proving the contract alleged. It should be borne in mind that this is not a claim against the estate of decedent for care and services rendered, but is a bill for the specific performance of an existing contract."

Also applicable here is the following:

"Testimony tending to establish nothing more than a father's unexecuted intention to will the farm to those of his children who remained at home and helped with the work is insufficient to establish a contract to that effect which may be specifically enforced.

"To authorize a. decree for specific performance, there must be a contract to enforce and the burden is on those who seek such relief to establish such a contract." *Kraus* v. *Vandevanter* (syllabi), 237 Mich. 168.

"Proof of an unexecuted intention is insufficient to warrant a decree of specific performance. A contract must be proved. *Paris* v. *Scott*, 267 Mich. 400; *King* v. *Luyckx*, 280 Mich. 117." *In Re Cramer's Estate*, 296 Mich. 44.

In the foreclosure proceedings plaintiff's intervenor's bill claimed no more than a right to ownership of the mortgages. He did not then profess to intervene as owner of the equitable title to the premises. In the instant case he has not sustained the burden of proving the claimed agreement on the part of his mother.

Decree affirmed, with costs to defendants.

BUSHNELL, C. J., and SHARPE, BOYLES, REID, NORTH, BUTZEL, and CARR, JJ., concurred.