JEAN ELIZABETH STUTSMAN et al., Appellants, v. CHARLES CRAIN et al., Appellees.

**WILLS:** Specific Enforcement of Contract in re Conflicting Wills.
1  An oral contract, under which a surviving wife agrees to waive her rights under a prior, unprobated will which is wholly in her favor, and to accept in lieu thereof assured support for life and the benefits of a later will which tenders lesser benefits to her, provided the latter will is not probated until after her death, is specifically enforcible after full execution by both parties to the contract.

**WITNESSES:** Agent's Testimony in re Transaction with Deceased.
2  An agent is a competent witness to testify to personal transactions and communications with a deceased relative in matters in which his principal is interested. So held where parents so testified in relation to matters growing out of the settlement of a will contest wherein they acted for their children, who were devisees under the will.

**PRINCIPAL AND AGENT:** Adopting Unauthorized Act. The authority of a parent to enter into a contract for and on behalf of his children becomes quite immaterial when the said children unreservedly adopt the acts of the parent.

**EVIDENCE:** When Satisfactory. Evidence is always of a high character when it produces in the mind an abiding conviction of the truth of the matter at issue.

*Appeal from Johnson District Court.*—R. P. HOWELL,
Judge.

FEBRUARY 18, 1919.

ACTION to enforce the specific performance of an oral
contract. The opinion states the facts. Decree dismissing
plaintiffs' petition in the court below. Plaintiffs appeal.—
*Reversed.*

*W. H. Stutsman, Seerley & Clark,* and *Wilson & Evans,*
for appellants.

*Milton Remley* and *Dutcher, Davis & Hambrecht,* for
appellees.

GAYNOR, J.—The plaintiffs in this suit are minors and
devisees under a will executed by one Samuel Sharpless n
the 11th day of May, 1901, but never probated. The defend-
ants are the devisees named in a certain
will executed by the wife of Samuel Sharp-
less, on the 28th day of February, 1912.
The facts out of which the controversy aris-
es are substantially these: Samuel Sharp-
less, during his lifetime and at the time of his death, was
the owner of a considerable estate, consisting both of real
and personal property. The plaintiffs are the minor chil-
dren of one Ada Sharpless Stutsman, adopted daughter
of Samuel. Whether she was legally adopted or not is not
material here. She was the daughter of Samuel's sister,
and lived in the Sharpless family from early childhood un-
til married to William Stutsman. She not only lived in
the family, but was cared for and nurtured with all the
tenderness of a natural child. On the 11th day of May,
1901, Samuel made what purports to be his last will and
testament. In this will, after providing for the payment
of his just debts, he devised to his wife, Priscilla F. Sharp-

1. WILLS: spe-
cific enforce-
ment of con-
tract in re
conflicting
wills.

less, all his property, for the period of her natural life; the remainder at her death to the children of Ada Sharpless Stutsman who might be living at the time of his wife's death. These children are the plaintiffs. Samuel Sharpless died soon after the making of this will, to wit, on or about June 5, 1901. This will was filed for probate on August 5, 1901. The widow, Priscilla Sharpless, appeared and contested, alleging that her husband, Samuel, was, at the time it was made, lacking in testamentary capacity. These objections were filed on September 7, 1901. At this time, there was also filed for probate a paper purporting to be the will of Samuel Sharpless, dated May 19, 1868. This paper was in due form of will, and executed in conformity with the statute, and gave to the widow, Priscilla Sharpless, all the property of Samuel, both real and personal, to have and to hold in her own right. The contest over the will of 1901 was brought to trial, and a verdict returned on December 6, 1901, finding that the testator, at the time of the making of the will of 1901, did not have sufficient mental capacity to make a will. No judgment, however, was entered upon the verdict until December 31, 1902, when a *nunc pro tunc* order was made, and judgment entered as of December 9, 1901. An appeal was taken to the Supreme Court, and the cause reversed on October 24, 1904, and remanded to the district court for further proceedings. On the 11th day of December, 1901, a few days after the return of the verdict, there was an attempt to secure the probate of the 1868 will, and a record was made duly admitting it to probate; and in December following, Peter A. Dey was appointed executor, and filed an inventory of the personal property of the estate, on or about April, 1902, and, on July 3, 1903, procured an order of allowance to the widow, Priscilla Sharpless, for her support for one year, pending the settlement of the estate. After the reversal of the judgment denying probate to the 1901 will, the matter was never

again called to trial. No procedendo was issued from the Supreme Court, and the matter stood as though no hearing had been had on the contest. It also appears, however, that nothing further was done under the pretended probate of the will of 1868. Peter A. Dey, as executor, performed no further duties as executor, and the allowance made to the widow was never paid. Priscilla Sharpless, the widow, lived until October 20, 1915. During all those years intervening between the death of her husband and her death, she used the income from the estate for her support and maintenance, but never touched any of the body of the estate, and it remained intact at the time of her death. On February 28, 1912, she made a will in which, after devising to the Ladies' Improvement League of Iowa City $100, the income from which was to be used each year to care for her resting place in the cemetery, she devised all the rest and residue of her estate, both real and personal, of which she died seised or possessed, to certain legatees named in her will. It is under this will that the defendants claim. The thought of the defendants is that Priscilla Sharpless, the widow, took the entire estate left by Samuel at the time of his death, under the will of 1868, and under her will, made in February, 1912, they took all the property, as the devisees of Priscilla. The contention of the plaintiffs is that, as to them, the will of 1868 was never legally probated; that they were interested in the estate under the will of 1901; that it was a later will, and that proceedings in probate are now pending in the district court, undisposed of; that the attempted probate of the 1868 will was made without notice to them, and without any appearance on their part, and is not binding upon them.

However that may be, the plaintiffs must recover on the strength of their own title, and, therefore, it becomes of primary importance to know just what they claim, and what the evidence is upon which they support their claim.

It will be noted, from what has been said, that these plaintiffs are the devisees named in the 1901 will. It is admitted that this will was duly executed by Samuel Sharpless in his lifetime, and in the execution of it, compliance was had with all the forms of law to make it a valid will. It is further conceded, for the purposes of this case, but for the purposes of this case only, that Samuel Sharpless had testamentary capacity at the time of its execution. Plaintiff's claim that, after the judgment denying probate of the 1901 will had been reversed by the Supreme Court, an agreement was entered into between Priscilla Sharpless, the widow, and these plaintiffs, through their father, by which it was agreed and understood that nothing further should be done in the probate of the 1901 will during the lifetime of Priscilla; that Priscilla should accept a life interest in the estate, and that these children should take what was provided for them in the will—the remainder after the expiration of the life estate. At the time the agreement was entered into, some question appears to have arisen as to whether or not the income of the estate would be sufficient to maintain Priscilla in the same style and comfort in which she had lived during the life of her husband, Samuel. The father of these plaintiffs, acting for them, agreed that, if she would accept the income of the estate, and let the *corpus* of the estate remain untouched, he would supply her with all that was needed, over and above the income, to maintain her in the same splendor and comfort in which she had lived during the life of her husband. She agreed to this, and from that time until her death, both parties acted on the assumption that the plaintiffs should receive the remainder, while Priscilla enjoyed the income from the estate during her natural life.

There are some things suggested by this record that the mind is able to grasp clearly and understandingly, to wit: That, prior to the filing of the 1901 will, Priscilla

entertained towards the mother of these children the kind-
liest feeling; that she considered and treated her as a
daughter, and loved her as such; that she was very fond
of her husband, Samuel,—admired and approved of him.
She not only loved him, but had unbounded confidence in
his love for her. She not only admired him and approved
of him, but considered him a man with a high sense of jus-
tice. When this will was filed, she felt humiliated and dis-
tressed to find that her husband, with whom she had lived
so many years, and for whom she entertained such tender
sentiments, had left her a life estate only in his property.
She could not account for it on any theory except that he
was not in his right mind at the time of the making of the
will. We think we are safe in saying that this record dis-
closes that her purpose was not mercenary, but rather a de-
sire to demonstrate that her husband did not purposely,
wilfully, and intelligently repudiate her as having first claim
upon his love. She felt that the long years of mutual love
and trust and confidence entitled her to this. This is the
only theory upon which her action in seeking to avoid the
will of her husband, on the plea of want of testamentary
capacity, can, we think, be rationally explained. She was
getting along in years, at that time, and was feeble in
health. The income from the property was abundant for
her support, and she loved the mother of these children as
a normal mother loves her own offspring. When this 1901
will was filed for probate, and she saw its contents, and
saw that the father and mother of these children were
urging its probate, she felt that an effort was being made
to force on the record proof that she did not stand first in
the love of her dead husband. She felt that these children
were seeking to take precedence over her in the one great
passion of her life, and she felt resentful. The contest
over the will was waged with bitterness, and the feeling
which it engendered extended to the mother and father of

these children. During the contest, no friendly communication passed between them. She was fighting for precedence in her husband's love. She resented the attempt to make evidence that others stood before her in his affection; so she contested the will, thinking, womanlike, that her husband could not have made her second in his affections, while in the possession of his normal faculties. The record discloses that she suffered intensely during this struggle for supremacy, and upon the reversal of the case, declared she would never pass through the same ordeal again. Immediately after the reversal, negotiations were opened between the father of these children and Peter A. Dey, the lifelong friend and counsellor of Mrs. Sharpless. So far as Mrs. Sharpless was concerned, the negotiations were con ducted with great diplomacy, and with commendable tenderness for her feelings in the matter. She refused to recognize the will; she refused to talk about the will; she refused to have anything further to do with the will. In all the proceedings, the record discloses that Peter A. Dey, a most honorable and reputable gentleman, of Iowa City, acted as her *alter ego;* and an agreement was made through him, acting for Mrs. Sharpless, that nothing further would be done in the probate of the 1901 will during her lifetime, —that she would accept the income from her husband's estate, and not touch the body of the estate during her life: this upon the express promise of the father of these children that, if the income of the estate was not sufficient to support her, he would contribute a sufficient sum to maintain her in the same style and comfort in which she had been maintained during the life of her husband. At the time of this trial, Mrs. Sharpless was dead. Peter A. Dey was dead. Much that might have been told is now closed to us. One thing is certain, though: that, immediately following the time when it is said that this agreement was made, the whole relatiouship between the Stutsmans and Mrs.

Sharpless changed. The old love and the old fellowship were renewed, and continued to the time of her death. She wrote, requesting Mrs. Stutsman, the mother of these children, to come and visit her. That came about in this way: Soon after the reversal, the mother of these plaintiffs, Ada Sharpless Stutsman, wrote to Peter A. Dey, saying, in substance, that she had heard that the will case had been reversed in the Supreme Court, and that the very thought of a new trial, with all it implied, filled her with consternation, both for herself and her "auntie," as she called her, and suggesting that some compromise be made that would avoid further contest. Peter A. Dey replied, October 27, 1904, saying:

"If you will agree upon some proposition that will meet with the approval of the court, and furnish your aunt a liberal support during her life, I will do all I can to have it accepted."

Upon the receipt of this letter from Peter A. Dey, Mrs. Sharpless wrote to the mother of these children, Ada Sharpless Stutsman, inviting her to come down, saying that she regretted very much that there had been any trouble at all between them, in any way, and that she wanted her to come and see her; that, if she would come down and meet Mr. Dey, there might be something done to prevent another trial. Mrs. Stutsman went down to see her on the Christmas following; went directly to the Sharpless home, where she had not been for many years, and remained a week or so; brought one of these children with her; talked with Mr. Dey and Mr. Remley about a settlement. (Mr. Remley had been attorney for Mrs. Sharpless in the contest.) She met Mr. Dey two or three times. Before she talked with Mr. Dey, however, she says she had a conversation with Mrs. Sharpless, who told her that Mr. Dey represented her, and that she would never have another law-

suit,—never would stand for another lawsuit, if they took everything.

Upon the record before us, we have no hesitancy in saying that the contract was made substantially as claimed by the plaintiffs; that this contract was made between William Stutsman, acting for these children, and Peter A. Dey, acting for Mrs. Sharpless; that the contract has been consistently observed by both parties since its making; that Stutsman has performed fully his part of the contract, made by him for and in behalf of his children; that it is a contract that the parties were competent to make, and is binding upon them.

It is urged, however, first, that the contract lacked mutuality.

It seems to be the thought that Mrs. Sharpless took all this property in controversy under the will of 1868; but this is not tenable. The will of 1901 was made later. It was pending in the district court for probate. Though never probated, it was subject to probate. If it was established as the last will and testament of Samuel, all rights which Mrs. Sharpless might claim under the will of 1868 were lost to her. There was a contingency which might result in forcing her to an election to take either under the will of 1901, or her distributive share. It was to settle and dispose of this controversy that the agreement was made. The practical effect of the agreement was that she would take what was left her under the will of 1901; that the will would not be pressed for probate until after her death; that, upon her death, it might be probated; that, during her life, she would receive simply what she has received and enjoyed. It is conceded that, if the plaintiffs prevail in this case, it may now be probated. Out of consideration for Mrs. Sharpless, Peter A. Dey, acting for her, urged these plaintiffs not to press the probate of the will until after her death, for the reasons hereinbefore stated,

as we believe. Everything in this record goes to indicate that she understood fully the terms of this contract. Mr. Dey was her confidential adviser and friend. He acted for her, and we think, no doubt, with her full knowledge of the effect of the agreement on her rights. No part of the estate was touched by her, although the record discloses that, at one time, she found the income of the estate insufficient to pay the taxes upon the property. As life tenant, it was her duty to pay the taxes. Appeal was made to Mr. Stutsman, under the terms of the contract, and thereafter he paid all the taxes upon the real estate. While she was enjoying the benefits in full, her letters, introduced in evidence, indicate a clear understanding, on her part, that she could enjoy only a life interest in the property, after the making of this contract.

The fact that a contract lacks mutuality at the time of its making, does not always make it unenforcible. Equity will enforce a contract, though in its inception lacking in mutuality, when it is shown that the party seeking the enforcement of the contract has fully performed all the conditions of the contract on his part to be performed. However, we do not think that this contract was lacking in mutuality. See *University of Des Moines v. Polk County H. & T. Co.*, 87 Iowa 36; *Murphy v. Hanna*, 37 N. D. 156 (164 N. W. 32); *Burnell v. Bradbury*, 67 Kan. 762 (74 Pac. 279); *Rank v. Garvey*, 66 Neb. 767 (92 N. W. 1025); *Dickson v. Stewart*, 71 Neb. 424 (98 N. W. 1085); *Burdine v. Burdine's Exr.*, 98 Va. 515 (36 S. E. 992); *Bryson v. McShane*, 48 W. Va. 126 (35 S. E. 848); *Seaton v. Tohill*, 11 Colo. App. 211 (53 Pac. 170).

Had litigation been continued, it may be conceded that there was some uncertainty as to what the final result would be, as affecting the rights of these parties. Two wills had been executed. One gave to Mrs. Sharpless the entire estate; the other gave to her only a life interest in the en-

tire estate. Under one will, these plaintiffs took nothing. Under the other will, they took a fee, subject to the life estate. The will in which these children were interested, was pending in the probate court at the time the agreement was made. The widow had the right to reject the will, and take her distributive share. It came to her as a matter of choice. Immediately after the disposition of the controversy over the 1901 will in the Supreme Court, she renewed her relations with these children. The mother love had returned, with all its dominating influence upon the mind. She was getting old, and the estate was large. She was promised that the will of 1901 would not be probated during her lifetime. She surrendered the uncertain rights coming to her under one of these wills, and these plaintiffs surrendered their right to probate at once the will that gave them all the rights they are now claiming. It is apparent that she did not want this contest. It is apparent that the thought of it was painful to her. She deliberately chose to accept what the 1901 will would give her, if probated, and claim no more, providing the will was not probated until after her death, and with the further consideration that, if the income of the property was not sufficient, the deficiency would be supplied by the father of these children. This agreement was fully carried out on both sides. The will was never probated, the deficiency was supplied, she enjoyed the income of the entire estate during her life, and the probating of the will was postponed until after her death.

It would be profitless to set out the many little incidents shown in this record which form in our minds an abiding conviction that this contract was made, substantially as claimed. It is a very old saying that "actions speak louder than words." Everything that was done, everything that was said, the personal relationships assumed, and the conduct of all the parties, emphasize the making of

this contract. The conduct of each is a logical, consistent result of the very agreement here pleaded and relied upon. All the footprints lead to the making of this contract.

It is next contended that, even though the contract seems to have been proven, yet the proof rests upon the testimony of incompetent witnesses. It is said that Mr. and Mrs. Stutsman, the father and mother of these children, were not competent witnesses, under the inhibition of the "dead man's statute," Section 4604, Code of 1897; and reliance is had upon *McClanahan v. McClanahan*, 129 Iowa 411. In that case, the witness was held incompetent because he was a person through whom the claimant derived an interest. The holding of that case would seem to sustain appellees' contention; and yet the facts might well be differentiated. We think this case comes within the rule, rather, of *Stiles v. Breed*, 151 Iowa 86; *Horner v. Maxwell*, 171 Iowa 660; and *Bird v. Jacobus*, 113 Iowa 194. No interest in this estate came to these plaintiffs from their father or mother. The estate comes to them, if at all, through the provisions of the will of Samuel. Neither the estate in dispute nor the interest sought to be recovered by the plaintiffs was derived from, through, or under their mother or father. Neither ever had or claimed any right, title, or interest therein. "From, through, and under" have reference to the devolution of title, and not to the agency by which it was effected. Neither the father nor the mother received, or will receive, any benefit from this contract, nor do these plaintiffs take anything by, through, or under their parents. The fact that the father was acting for these children and in their behalf does not make him an incompetent witness under the statute. An agent of a party to a suit is not incompetent, under the statute. *Chicago, R. I. & P. R. Co. v. McElhany*, 182 Iowa 1035.

2. WITNESSES: agent's testimony in re transaction with deceased.

It is next contended that the contract is not enforcible because it is not shown that the father of these children had authority to make the contract for and in their behalf. The answer to this is simply that

**3. PRINCIPAL AND AGENT: adopting unauthorized act.** they have adopted the contract, and are now seeking to enforce it. There is no merit in the contention that Peter A. Dey was not the

agent of Mrs. Sharpless, and that his act in making the contract was not binding upon her. We have adverted to this before. The record leaves no doubt existing as to the relationship between Mrs. Sharpless and Mr. Dey,—no doubt that she understood and consented to all that was done in the making of this contract; that he was, in the fullest sense, authorized to act for and to represent her in the making of the contract.

It is said that the contract is not proven by that high degree of evidence which is required in controversies of this kind. To this we have to say that evidence is always

**4. EVIDENCE: when satisfactory.** of a high character when it produces in the mind an abiding conviction of the truth of the matter sought to be established.

There is evidence of the making of this contract,—competent evidence; and every fact and circumstance, following the time when it is alleged the contract was made, support and sustain that testimony.

We think the contract is fully proven by competent evidence, and the plaintiffs were entitled in the court below to a decree as prayed. The decree of the district court is, therefore, reversed, and with direction to enter a decree in plaintiffs' favor as prayed.—*Reversed.*

LADD, C. J., PRESTON and STEVENS, JJ., concur.